David L. **WILKINSON**, Plaintiff,

v.

**LEGAL SERVICES CORPORATION,**
**Defendant.**

No. Civ.A. 91–0889 (JHG).

United States District Court,
District of Columbia.

Nov. 19, 1998.

As Amended Nov. 20, 1998.

See also, 80 F.3d 535.

**34**

Reuben B. Robertson, Washington, DC, for David L. Wilkinson, plaintiff.

Charles Samuel Fax, Shapiro & Olander, Baltimore, MD, Niccolo N. Donzella, Baltimore, MD, for Legal Services Corporation, defendant.

Allison C. Giles, U.S. Department of Justice, for United States of America, intervenor-defendant.

### *OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

In 1989, defendant Legal Services Corporation ("LSC") hired plaintiff David Wilkinson ("Wilkinson") to be its first Inspector General ("IG"). Wilkinson's tenure was fraught with internal dissension and managerial gridlock, and, in February 1991, LSC notified Wilkinson that his employment contract would not be renewed. Wilkinson sued in three counts. One of the counts raised an important and undecided constitutional issue concerning the Board's authority to fire him, which, along with a second count, has been finally resolved.[1] Although not previously apparent, the remaining Count III also raises an important question of first impression concerning the obligations of "private" corporations that have been created by Congress to follow their own rules.

■ This novel issue arises from Wilkinson's claim that he was wrongfully discharged because LSC failed to comply with its personnel manual before it notified him that his contract would not be renewed. On its face, such a claim is hardly new. When brought against a private employer, a discharged employee's claim based on a personnel manual is generally styled as breach of contract, alleging that the manual is binding on the employer because it incorporates the terms of an express or implied agreement.[2] If the claim is brought against a government agency, a discharged employee may argue that the personnel manual gave rise to a "property" interest in continued employment that was deprived without due process of law or that the manual set forth internal regulations that the agency was bound to follow under the *Accardi* doctrine.[3]

The novelty in this case arises from Wilkinson's exclusive reliance on the Due Process Clause and the *Accardi* doctrine, both of which apply only to public agencies, even though Congress has declared that LSC "shall not be considered a department, agency, or instrumentality, of the Federal Government," 42 U.S.C. § 2996d(e)(1).[4] Conse-

---

1. *See generally Wilkinson v. Legal Services Corp.,* 865 F.Supp. 891 (D.D.C.1994) [hereafter *Wilkinson I*]; *rev'd in part by,* 80 F.3d 535 (D.C.Cir.) [hereafter *Wilkinson II*]; *cert. denied,* —— U.S. ——, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996).

2. *E.g., Sisco v. GSA National Capital Federal Credit Union,* 689 A.2d 52, 54–56 (D.C.1997); *United States ex rel. Yesudian v. Howard University,* 153 F.3d 731, 745–48 (D.C.Cir.1998).

3. The *Accardi* doctrine holds that government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions. *See United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 267–68, 74 S.Ct. 499, 98 L.Ed. 681 (1954). An example of an *Accardi* claim based on a personnel manual is *Frizelle v. Slater,* 111 F.3d 172, 177 (D.C.Cir.1997). Both Due Process and *Accardi* claims were advanced in *Mazaleski v. Treusdell,* 562 F.2d 701, 709–10 & n. 23 (Due Process), 717–720 (*Accardi* claim) (D.C.Cir.1977).

4. Wilkinson's Due Process and *Accardi* arguments are made in the alternative because a 1978 and a 1990 version of the LSC personnel manual

quently, this case now presents two threshold questions:

1) Can a congressionally-created, private corporation be sued for violation of the Due Process Clause?

2) Can a congressionally-created, private corporation be sued for violating its own rules under the *Accardi* doctrine?

For constitutional claims, the Court must independently determine whether LSC is a public or private agency, notwithstanding the disclaimer of governmental identity in § 2996d(e)(1). *See Lebron v. National RR Passenger Corp.*, 513 U.S. 374, 392, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). As to the *Accardi* claim, even if LSC is a public agency for constitutional purposes, the Court also must address whether Wilkinson's *Accardi* claim derives from the Constitution or from a lesser source. *See id.* Although this and other courts deciding administrative law cases routinely invoke the *Accardi* doctrine as a "well settled" or "familiar" principle, *e.g., Fort Stewart Schools v. Federal Labor Relations Auth.*, 495 U.S. 641, 654, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990); *Woerner v. United States Small Business Admin.*, 739 F.Supp. 641, 646 (D.D.C.1990) (Green, J.), the principle has become "well settled" only by judicial repetition; its origins are quite obscure.

Consequently, this Opinion relates two stories: the story of how Wilkinson came to join and then leave LSC, and the story of how the Supreme Court came to announce and apply the *Accardi* doctrine, on which Wilkinson so heavily relies. For those who wish to forgo the narrative journey, the Court has come to the following conclusions.

With respect to the threshold legal issues, the Court holds that LSC is a public agency subject to the Due Process Clause. The Court also must reach Wilkinson's alternative *Accardi* claim and holds that the *Accardi* doctrine derives from the Due Process Clause's obligation that government agencies follow the law, even if that "law" is a procedural regulation by which the agency has gratuitously limited its otherwise unfettered discretion. This rule-of-law requirement is a necessary founding principle implicated in any suit against the government for its violations of law. But the constitutional stature of this founding principle does not make every agency's violation of its own rules into a constitutional violation. Unless the agency has violated an independent constitutional provision, a lawsuit based on the *Accardi* doctrine relies on the predicate requirement that government agents are bound by law, but, for jurisdictional purposes such a claim arises under the regulation claimed to be violated, not the Due Process Clause.

Applying this holding to the instant case, the Due Process Clause creates a presumption that judicial review of an *Accardi* claim against a government-created "private" corporation is available where Congress has given the corporation the power to make regulations that have the force and effect of law. Where, however, Congress has not given lawmaking power to such a corporation, the *Accardi* doctrine does not apply; the corporation's personnel policies are no more public "law" than those of any other private employer.[5]

With respect to Wilkinson's claims, the Court finds that although they are not barred as a matter of law, the evidence supports neither claim. With respect to his Due Process claim, the Court finds that Wilkinson was not guaranteed that he would be dis-

---

exist. Wilkinson's first argument is that the 1978 Manual applies, and, under that manual, LSC could only discharge him for cause. Wilkinson did not explicitly style this as a Due Process claim, but numerous cases treat a public employee who cannot be fired except for cause as possessing a property right in continued employment that cannot be taken away without due process. *E.g., Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120 (1997). Giving Wilkinson the benefit of the doubt, the Court will treat his argument based on the 1978 Manual as a Due Process claim.

In the alternative, Wilkinson argues that under the 1990 Manual, even if LSC could have discharged him for any reason, it failed to conduct the periodic job performance evaluations it was required to do. For this claim, Wilkinson relies on the *Accardi* doctrine, claiming that the job evaluation procedures were binding regulations that LSC disregarded.

5. Of course, a discharged employee could bring a "private law" claim, breach of contract, against such a corporation according to the standards set forth in the cases cited above in n. 2.

charged only for cause by either the 1978 or the 1990 manual, and therefore he had no property interest in staying on. With respect to the *Accardi* claim, the Court further finds that on the present record the 1990 Manual did come into force and that the provisions of the manual on which Wilkinson relies do not qualify as binding regulations and, even if they did, they do not apply to the LSC Inspector General. Finally, it is clear that even if LSC had been obliged to give Wilkinson periodic job evaluations, its failure to do so was harmless because Wilkinson's contract would not have been renewed in any event. What follows are the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

### A. The Legal Services Corporation

The Legal Services Corporation is a non-profit, tax-exempt corporation established by the Legal Services Corporation Act of 1974 ("LSC Act"), codified at 42 U.S.C. § 2996b *et seq.* (1994). LSC provides financial support for legal assistance in certain noncriminal proceedings to persons throughout the United States who cannot otherwise afford legal assistance. LSC generally does not provide legal services to the indigent directly but does so through a series of grants to local organizations. *See* 42 U.S.C. § 2996e(c)(1). During the time relevant to this case, LSC distributed funds to approximately 300 grantees. *See* Trial Transcript ("Tr.") at 187–88 (Testimony of former Board member, Howard H. Dana, Jr.).

By law, LSC is governed by an eleven-member Board of Directors ("Board"). *See* 42 U.S.C. § 2996c(a). Board members are appointed by the President of the United States with the advice and consent of the Senate and serve a specific term of years. *Id.* § 2996c(a), (b). However, certain members of the Board have served under recess appointments made by the President without the advice and consent of the Senate. *See* Stipulations of Fact ("Stip.") ¶ 3. Although the Board is composed wholly of political appointees, the LSC Act declares that its members shall not be full-time employees of the United States, *id.* § 2996c(a), and that Board members "shall not, by reason of such membership, be deemed officers or employees of the United States." *Id.* § 2996c(c).[6]

The LSC Act also provides that LSC is to be managed by a President, who is elected by the Board and serves as chief executive officer subject to the Board's supervision. *See* 42 U.S.C. § 2996d(a). The Board may also appoint "such other officers as [it] determines to be necessary." *Id.* As with the Board, Congress has directed that

> Except as otherwise specifically provided in this subchapter, officers and employees of the Corporation shall not be considered officers or employees, and the Corporation shall not be considered a department, agency, or instrumentality, of the Federal Government.

42 U.S.C. § 2996d(e)(1). Rather, LSC is to have the powers of a non-profit corporation under District of Columbia law. *See* 42 U.S.C. § 2996e(a).

LSC, however, is not like most non-profit corporations. Not only is it controlled entirely by presidential appointees, but also— like numerous other agencies and unlike most non-profit corporations—LSC has been required to have an Inspector General who reports to Congress since 1988.[7] Although for some agencies, the IG is nominated by the President and confirmed by the Senate,[8]

---

6. In *Wilkinson I*, this Court held that for constitutional purposes, Board members were officers of the United States, but for statutory purposes they were not. *See Wilkinson I*, 865 F.Supp. at 896–97. On appeal, the D.C. Circuit did not reach the merits and reversed only on the grounds that Wilkinson was estopped from challenging the authority of the Board to act. *See Wilkinson II*, 80 F.3d at 539.

7. *See* Inspector General Act Amendments of 1988, Pub.L. No. 100–504, § 104(a), *codified at* 5

U.S.C.App. 3 § 8G(a)(2) (making LSC a "designated federal entity" required to have an IG). In a codification snafu, two § 8G's were enacted for some time. That error has been corrected. *See* Pub.L. No. 104–208, Div. A, Tit. I, § 101(f), 110 Stat. 3009–379 (Sept. 30, 1996).

8. *See, e.g.* 5 U.S.C.App. 3 § 3(a); H.R.Rep. 100–1020, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 3179, 3179 (Sept. 30, 1988) (noting that Pub.L. No. 100–504 requires President to

when Congress amended the IG Act in 1988, it gave the "designated federal entities" such as LSC six months from October 18, 1988 to establish an Office of Inspector General and authorized the "head" of LSC to recruit an individual to fill the position. *See* 5 U.S.C.App. 3 § 8G(b), (c).[9]

## B. Wilkinson's Tenure at LSC

In 1989, to comply with the IG Act, LSC established its Office of Inspector General ("OIG"). LSC selected Wilkinson to be its first Inspector General. Wilkinson is an attorney licensed to practice in Utah who, prior to joining LSC, had served as that State's Attorney General for eight years. *See* Tr. 74, 117 (Wilkinson). When Wilkinson arrived at LSC, he had no prior experience as an Inspector General, and LSC had no prior experience working with an IG. Wilkinson's place in the LSC bureaucracy was made somewhat uncertain by the IG Act, which provides that

> Each Inspector General shall report to and be under the general supervision of the head of the designated Federal entity. The head of the designated Federal entity shall not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation . . .

5 U.S.C.App. 3 § 8G(d).

A certain degree of confusion and, perhaps, tension could be expected in such a situation. Indeed, almost immediately, friction and concern over "turf" developed between Wilkinson, LSC staff, and certain members of the LSC Board. *See, e.g.,* Tr. 155–58 (Testimony of LSC's former Director of the Office of Human Resources, Alice Dickerson), 189 (Dana); 210 (Testimony of former Board member, Luis Guinot). In April 1990, the LSC President who had hired Wilkinson, Terrance J. Wear ("Wear"), called a meeting to identify and resolve contentious issues between Wilkinson and LSC staff, but

that meeting bore no fruit. *See* Tr. at 154–59 (Dickerson).[10]

In August 1990, the LSC Board was designated as LSC's "head," giving it supervisory responsibilities over Wilkinson. This change did nothing to abate the tensions with Wilkinson. The Board decided to create an Inspector General Oversight Committee because of the amount of attention Wilkinson required. Tr. at 186 (Dana), 210 (Guinot). The weight of the evidence demonstrates that the friction between Wilkinson and the LSC staff and Board went beyond that inherent in the circumstances. Wilkinson's focus on establishing and protecting the independence and prerogatives of the OIG at the expense of establishing a working relationship with his supervisor (the Board) and LSC staff emerged as a constant source of friction.

A small but telling example is found in the testimony of two former Board members—testifying more than eight years after certain events had transpired—who credibly and vividly recalled the inordinate attention Wilkinson gave to obtaining his own letterhead. *See* Tr. at 187, 189–90 (Dana), 211 (Guinot); *see also* Def.'s Ex. 11 (Tr. of Jan. 28, 1991 Board Meeting) at 54, 60.

More fundamentally, Wilkinson's view of his role under the IG Act conflicted materially with that of the Board and the LSC President. In the normal course of operations, LSC's grantees were required to have an annual, independent audit by a Certified Public Accountant. Part of the responsibility of LSC staff was to ensure compliance with that requirement. Wilkinson initially believed that his office should audit all of LSC's grantees. *See* Tr. at 187–89 (Dana); Def.'s Ex. 11 (Tr. of Jan. 28, 1991 Exec. Sess.) at 49–53. The Board did not agree. *Id.*

Another source of frustration to Wilkinson, the LSC Board, and the LSC President was

---

appoint IG for five agencies including the Departments of Justice and Treasury).

**9.** Responsibility for designating a "head" of LSC was delegated to the Office of Management and Budget ("OMB"). Initially OMB designated the LSC President as its "head" for purposes of the IG Act. *See* 54 Fed.Reg. 47158–59 (Nov. 9, 1989). In August 1990, OMB redesignated the LSC

Board as the agency's "head" for purposes of the IG Act. Stip. ¶ 9; 55 Fed.Reg. 34101–02 (Aug. 21, 1990).

**10.** For unrelated reasons, the Board replaced Wear with David H. Martin ("Martin"), who took office on October 1, 1990.

the fact that Wilkinson had not hired auditors to assist him in carrying out his duties—even those on which he and the Board agreed. The IG Act provided Wilkinson with hiring authority, although less expansive than that given to IG's of executive agencies. *Compare* 5 U.S.C.App. 3 § 8G(g)(1), (2) *with id.* § 6(a)(7), (8). Wilkinson had authority to

> select, appoint, and employ such officers and employees as may be necessary for carrying out the functions, powers, and duties of the Office of Inspector General and to obtain the temporary or intermittent services of experts or consultants or an organization thereof, subject to the applicable laws and regulations that govern such selections, appointments, and employment, and the obtaining of such services, within the designated Federal entity.

*Id.* § 8G(g)(2). Wilkinson did not exercise that authority to hire auditors. He testified that Wear would not authorize funding to hire auditors, and that Wear's successor, Martin, did not rapidly authorize the hiring of auditors. *See* Tr. at 2–23, 2–24 (Wilkinson). LSC Board members viewed the responsibility for the stalemate as Wilkinson's. *Id.* at 189–90, 201–02 (Dana), 212 (Guinot); *see also* Def.'s Ex. 11 (Tr. of Jan. 28, 1991 LSC Board meeting) at 59–60. In any event, it is undisputed that Wilkinson hired no auditors. Tr. at 2–23.

Finally, the issue of hiring other staff for the OIG was an ongoing tug-of-war between Wilkinson and Alice Dickerson, former Director of LSC's Office of Human Resources. Again, some tension is to be expected from the structure of the IG Act, which makes the IG's hiring authority subject to LSC's personnel regulations. But Wilkinson's highly formal approach to mediating that tension by negotiating a detailed Memorandum of Understanding ("MOU") exacerbated the problem.

## C. Wilkinson's Discharge

In early 1991, the cumulative dissatisfaction with Wilkinson came to a head. Under the terms of Wilkinson's letter agreement, he was to serve in office for an initial two-year term, which would automatically extend for subsequent one-year terms unless either party gave timely notice of nonrenewal. Stip. ¶ 7. The deadline for giving notice was March 5, 1991. *Id.*

On January 28, 1991, the Board met in executive session to consider a number of matters. During that meeting, the Board discussed whether Wilkinson's contract should be renewed. A fairly strong, though informal, consensus against renewing the contract emerged. *See* Def.'s Ex. 11 at 50–65. Subsequently, Wilkinson himself indicated frustration, contemplating that he would not wish to renew the contract absent certain guarantees. *See* Def.'s Ex. 13 (Feb. 22, 1991 Mem. from Wilkinson to LSC Board) at 10 ("Without MOUs or their equivalent being in place, I for one do not care to remain IG for my "option" (third) year under my personal services contract.").

The next executive session was scheduled for February 22, 1991, the final opportunity for the Board to act before the March 5 deadline. In advance of that meeting, on February 12, Guinot sent Wilkinson a letter requesting by February 22, "a memorandum from you describing your activities as Inspector General pursuant to §§ 4, 6 and 7 of The Inspector General Act of 1978, as amended . . . . . . The memorandum need have only sufficient detail so as to reasonably inform the [Oversight] Committee of the progress of the office under your direction, and need not identify any individuals by name." Pl.'s Ex. 19 (Feb. 12, 1991 letter from Guinot to Wilkinson).

At the February 22 executive session, the Board formally considered whether it should renew Wilkinson's contract. The discussion of that topic took place before the Board had received Wilkinson's report as requested by Guinot's February 12 letter; however the report's absence was deemed to be immaterial. *See* Def.'s Ex. 14 (Tr. of Feb. 22, 1991 Exec. Sess.) at 31–32. At the conclusion of the discussion, ten of the Directors voted not to renew Wilkinson's contract, with one Director abstaining. Stip. ¶ 12. On or about February 27, LSC President Martin personally delivered to Wilkinson a February 25, 1991 letter signed by the Chairman of the Board giving Wilkinson notice that the term

of his employment contract would not be extended. Stip. ¶ 13.[11]

## D. Wilkinson Sues LSC

On April 23, 1991, while Wilkinson remained a LSC employee, he sued LSC alleging that it had violated the Government in the Sunshine Act, 5 U.S.C. § 552b, by conducting certain portions of its meetings in executive session. *See Wilkinson v. Legal Services Corp.,* Civ. No. 91–0889 (Order of Sept. 5, 1991). In August of that year, Wilkinson added two counts, including one for wrongful discharge. On the eve of his September 5, 1991 departure from LSC, he unsuccessfully sought injunctive relief. *Id.* After this Court denied Wilkinson's request for an order requiring LSC to keep him on, he pressed his claim for wrongful discharge. This Court previously ruled in Wilkinson's favor on Counts I and II, deciding that the LSC Board had violated the Sunshine Act, and that the Board—appointed by President Bush while the Congress was in recess—lacked the authority to decide not to renew Wilkinson's contract. *See Wilkinson I,* 865 F.Supp. at 896, 902. The United States, which had intervened as of right in this action, appealed the recess appointments issue. The Court of Appeals did not disagree with this Court's conclusion that the Board had been improperly appointed. Rather, in reliance on its intervening decision in *Robertson v. FEC,* 45 F.3d 486 (D.C.Cir.1995), the Court of Appeals reversed and remanded, holding that Wilkinson, as a beneficiary of continued employment and cost-of-living wage increases under the Board, was barred by the doctrine of constitutional estoppel from challenging the Board's authority to act. *Wilkinson II,* 80 F.3d at 539.

The case was remanded so that this Court could consider Wilkinson's "claim that the termination of his employment violated the LSC by-laws and Act. . . . This claim is not a categorical, structural challenge to all the recess appointments Board's action but rather focuses on the legality of the specific action which resulted in Wilkinson's termination." *Wilkinson II,* 80 F.3d at 539.[12]

## II.

Against this backdrop, we now turn to the facts directly pertinent to Count III. Wilkinson alleges that LSC did not have the discretion to discharge him as it did, and the relevant sources that may have limited LSC's discretion are the LSC Act, the IG Act, Wilkinson's employment agreement, and LSC's personnel manual(s).

### A. Statutory Provisions

Although Count III is phrased in terms of alleged violations of the LSC Act, Wilkinson did not rely directly on that Act at trial. The reason is self-evident; the LSC Act provides: "All officers shall serve at the pleasure of the Board." 42 U.S.C. § 2996c(a) (emphasis added). In addition, the LSC President, "subject to general policies established by the Board, may appoint and remove such employees of the Corporation as he determines necessary to carry out the purposes of the Corporation." *Id.* § 2996d(b)(1).

The Inspector General Act is of no more assistance to Wilkinson. The IG Act does not restrict the Board's authority to discharge the IG, adding only the requirement that:

> If an Inspector General is removed from office or is transferred to another position or location within a designated Federal entity, the head of the designated Federal entity shall promptly communicate in writ-

---

**11.** As it later turned out, Martin may well have had personal motivations for seeking Wilkinson's departure. *See* Pl.'s Ex. 23 (Tr. of July 8, 1991 Exec. Sess.) at 24–33. But, although the Board was aware at the time that Wilkinson had focused some investigative effort on Martin, its February 22, 1991 decision was independent of, and unaffected by, Martin's personal motivations.

**12.** Following remand, the parties filed cross motions for summary judgment on Count III. In a *Memorandum Opinion and Order* filed October 14, 1997, this Court granted LSC's motion in part and denied it in part and denied Wilkinson's motion altogether. The Court ordered supplemental briefing on the question of whether the *Accardi* doctrine applies to LSC and held a two-day bench trial to resolve outstanding factual disputes in the event that it does.

ing the reasons for any such removal or transfer to both Houses of the Congress. 5 U.S.C.App. 3 § 8G(e).

### B. Employment Agreement

Other than a seasonable notice requirement, Wilkinson's two-year employment agreement also left LSC free not to renew the contract for any reason. After LSC had chosen Wilkinson as its IG-designate, LSC President Wear sent Wilkinson a three-page letter agreement, dated August 17, 1989, outlining the proposed terms of employment. Wilkinson could have negotiated the terms, but he declined that opportunity. *See* Tr. at 117. By signing the agreement, Wilkinson accepted the IG position on the terms LSC had offered. *Id.* Among these was a provision that the agreement would be governed by the law of the District of Columbia. Wilkinson did no research regarding legal presumptions covering employment contracts in the District of Columbia, including the presumption that employees are at-will unless the contract evidences a contrary intent. *See id.* at 101.

The large majority of LSC employees did not have letter agreements setting out their terms of employment. At most, the LSC President and perhaps three or four other senior staff had written agreements. Tr. at 103 (Wilkinson Test.); *see also* Def.'s Ex. 11 (Tr. of Jan. 28, 1991 Exec. Sess.) at 67.

Two provisions of Wilkinson's agreement cover the termination of his employment:

5. Your employment in the capacities outlined above may be terminated by the [LSC] President[13] prior to September 6, 1991, upon the happening of any of the following events:

 (a) Your death;

 (b) Failure to discharge your obligations under this contract;

 (c) Illegal or immoral conduct by you;

 (d) Thirty (30) days after you send written notice to the President or his des-

ignee (or if there is no President, to the Chairman or a member of the Board) stating your intention to terminate your employment; or

 (e) Thirty (30) days after the President notifies you in writing that he is terminating your employment for any reason other than those specified in subparagraphs (a) through (d).

. . . .

6. The [LSC] President shall have the option of extending your appointment for increments of one year, beginning on September 5, 1991. In the event either party shall not desire such an extension, notice must be given to the other party by March 5, 1991, or by the 5th of March of each succeeding year in which this contract shall be in effect.

Def.'s Ex. 2 (Aug. 17, 1989 letter from Terrance J. Wear to David Wilkinson).

At trial, Wilkinson effectively conceded that Paragraph 6 imposes no restrictions on LSC's decision whether to exercise its renewal option, but he argued that the provisions of LSC's personnel manual applied to Wilkinson and independently limited LSC's discretion. *See* Tr. at 24–25.

### C. LSC's Personnel Manual(s)

In 1978, LSC adopted its first personnel manual to set forth its policies and procedures vis-à-vis its employees. *See* Stip. ¶ 4; Pl's. Ex. 9 (Personnel Procedures Manual) [hereafter "the 1978 Manual"]. The procedure for adopting the 1978 Manual was *ad hoc*. The 1978 Manual was written by LSC Staff. The Board had created a Personnel and Facilities Committee, which informally reviewed the proposed manual as it took shape. When the 1978 Manual was complete, that Committee determined that no formal motion or approval of the Committee recommending the 1978 Manual to the Board was necessary because matters addressed by the 1978 Manual were primarily administra-

---

**13.** The agreement contemplated that the LSC President would function as the "head" of LSC for purposes of conforming the employment contract to the IG Act. After August 21, 1990, when OMB designated the LSC Board as the "head" of LSC, the parties in practice substituted the LSC Board for the President in terms of meeting their respective contractual obligations. *See* Stip. ¶ 10; Def.'s Ex. 8 (Draft Memorandum of Understanding between Wilkinson and Dickerson) at I–3.

tive. *See* Pls. Exs. 1 (Minutes of Sept. 25, 1978 Meeting of LSC Board's Personnel and Facilities Comm.) and 3 (Oct. 4, 1978 Mem. from LSC Pres. to LSC Board). The manual was assembled as a looseleaf binder to allow for periodic revision. *See* Pl.'s Ex. 4 (Tr. of Oct. 19, 1978 Board Meeting) at 280.

As anticipated, LSC staff continuously revised the 1978 Manual without oversight by the Board, and by 1985 the 1978 Manual had become "badly outdated" and was not distributed to employees. Tr. at 167–68 (Dickerson).[14] When Wilkinson joined LSC in 1989 he did not receive a copy of the 1978 Manual. In fact, he did not become aware of its existence until well into the pendency of this litigation. *See* Tr. at 82–83.

From 1986 to 1990, Ms. Dickerson was the principal draftsperson for a new, updated personnel manual. *Id.* at 135. Working with her on the revisions to the personnel manual were other senior LSC employees and outside counsel. *Id.* at 138. When the revisions were complete, the group researched whether the Board would have to approve the revised personnel manual before it took effect, and they concluded that Board approval was not required. *Id.*

In or about March 1990, approximately six months after Wilkinson arrived, LSC issued the revised personnel manual. Stip. ¶ 8. The Board did not consider or discuss the revisions. *See* Tr. at 193–96 (Dana). Although the 1978 Manual and 1990 Manual differ in organization and tone, they are substantially similar in many respects relevant to this case. Both provide that LSC employees are to receive a performance evaluation from their supervisor 90 days after employment has commenced, and that employees are to be evaluated on an annual basis thereafter. Both versions also provide that if a supervisor finds an employee's performance to be lacking in some respect, the employee is to

be placed on a performance improvement plan. *Compare* Pl.'s Ex. 9 (1978 Manual) at I–18, III–20–21, V–4–5 *with* Pl.'s Ex. 14 (1990 Manual) at 10, 16, 47–48.

There are three significant differences. First, the 1990 Manual contains provisions explicitly stating that LSC is an employer-at-will and that LSC employees are provided no enforceable rights under the 1990 Manual.

For example, the new introduction to the 1990 Manual reads in pertinent part:

> This Personnel Policy Manual consists of personnel policies, practices and procedures of the Corporation. It is intended to standardize the administration of personnel policies and is presented as a matter of information only. None of the benefits or policies in this manual are intended by reason of their publication to confer any rights or privileges upon an employee, or to entitle an employee to be, or remain, employed by the Corporation.
>
> None of the statements contained in this manual are to be construed as a contract, and the manual may be altered, amended or eliminated from time to time as the Corporation in its judgment deems appropriate.

Pl.'s Ex. 14 (1990 Manual) (introduction). No similar disclaimer is in the 1978 Manual. The 1990 Manual reiterates the point in at least two other places. In a section entitled "Employment–At–Will," the 1990 Manual states that

> The Corporation is hopeful that each employment relationship will be a successful and enduring one. However, employees are employed at the will of the Corporation and may be terminated at any time, with or without cause, and with or without notice and may resign at any time, for any or no reason, with or without notice.

---

14. Wilkinson submitted deposition testimony from Ms. Dickerson's predecessor, Robert Fuller, taken in a previous action filed in this District by former LSC employees alleging wrongful termination. *See* Pl.'s Ex. 6 (Dep. of Robert Fuller, Jan. 30, 1985, in *Newman v. Legal Services Corp.*, Civ. No. 84–3345). Fuller testified in January 1985 that the 1978 Manual had not been revised. *See id.* at 25. But the Court credits Alice Dickerson's testimony and finds that numerous revisions had been made to LSC's personnel manual without the knowledge or approval of the LSC Board. It may be that the testimony of the two is consistent if Fuller understood "revision" to mean substitution of pages in the manual; Ms. Dickerson testified that revisions were made by separate memoranda issued by the Office of Human Resources rather than by issuing substitute pages for the 1978 Manual. *See* Tr. at 167–68.

*Id.* at 8; *see also id.* at 61 ("Employees are employed at the will of the Corporation and may be terminated or have the right to voluntarily resign at any time.").

Second, the description of employees to whom the Manual applies was changed. The 1978 Manual includes in its definition of "Regular Employees," "Employees who are hired for continuous predetermined periods of employment that exceed 1 year." Pl.'s Ex. 9 at I–2. By contrast, the 1990 Manual defines "Regular Employees" as "individuals, hired for continuous and undetermined periods of employment." Pl.'s Ex. 14 at 5. The 1990 Manual does not define a category of contract employee that would describe Wilkinson.

Third, the provisions governing terminations were changed. The 1978 Manual sets forth four categories of termination that boil down to gross insubordination, unsatisfactory job performance, resignation and furlough. *See* Pl.'s Ex. 9 at V–6. But the manual also suggests that during a probationary period—when job security is generally less—an employee may be dismissed "for cause." *Id.* at I–18. By contrast, the severance section suggests a broader range of terminations that include reasons such as "an irreconcilable personality conflict that interferes with achievement of departmental goals or operations" and a termination where the incumbent lacks certain skills or characteristics. *Id.* at III–19.

The 1990 Manual classifies terminations simply as voluntary or involuntary and requires only that Office Directors obtain clearance from the personnel office in advance of any "involuntary terminations," i.e. firings.[15] The clearance procedure was designed to ensure consistent application of LSC's policies and procedures. Tr. at 149–50 (Dickerson). The absence of clearance, however, would not invalidate a sudden termination. *E.g.,* Pl.'s Ex. 14 at 61. Moreover, the clearance provision applies to Office Directors; neither the Board nor the LSC President would be required to clear a termination decision before firing an employee.

Neither the 1978 Manual or the 1990 Manual were published in the Federal Register, *cf.* Pl.'s Ex. 16 (Fed.Reg. Index showing no publication of personnel regulations in 1990), even though LSC has the power and the obligation to publish its rules, regulations, and guidelines in the Federal Register:

> The Corporation shall afford notice and reasonable opportunity for comment to interested parties prior to issuing rules, regulations, and guidelines, and it shall publish in the Federal Register at least 30 days prior to their effective date all its rules, regulations, guidelines, and instructions.

42 U.S.C. § 2996g(e).

## D. Wilkinson's Draft MOU Concerning the 1990 Manual

Shortly after Wilkinson arrived at LSC, it became clear that he and Alice Dickerson took differing views as to what role, if any, the LSC's Office of Human Resources would play in the process of hiring, placing, and firing OIG employees. Once the 1990 Manual was in place, Dickerson requested that Wilkinson, when recruiting staff, abide by the 1990 Manual. Wilkinson was initially resistant. The IG Act gave him hiring authority subject to the "laws and regulations that govern [personnel actions] within the designated Federal entity." 5 U.S.C.App. 3 § 8G(g)(2).

Contrary to what he argues in this lawsuit, Wilkinson at the time asserted that the 1990 Manual was neither a "law" nor "regulation" within the meaning of the IG Act, and that the OIG would only consent to comply with the personnel manual to the extent set forth in a Memorandum of Understanding ("MOU") between his office and Dickerson's. Tr. at 95 (Wilkinson), 141 (Dickerson); Def.'s Ex. 8 (Draft MOU). Wilkinson drafted an extensive MOU commenting on a section-by-section basis as to which provisions of the

---

**15.** The 1990 Manual provides that:
The Office of Human Resources/Equal Opportunity must be notified of any intention to terminate an employee by the Office Director prior to the effective date of the termination.

All requests for immediate terminations must be cleared with the Office of Human Resources/Equal Opportunity prior to dismissal. Pl.'s Ex. 14 at 11.

1990 Manual he was willing to have apply to his office.[16]

Regarding the 1990 Manual's clearance procedure for Office Directors who planned to fire an employee, Wilkinson's draft MOU stated that

> The OIG agrees to notify OHR and the Office of Financial and Administrative Services of a voluntary or involuntary termination of an OIG employee. However, the OIG reserves the right to effect an immediate termination without prior clearance and *the Board of Directors may likewise terminate the Inspector General without prior clearance.*

Def.'s Ex. 8 at I–4 (emphasis added). The MOU was never signed.

### E. Compliance With the Manual(s)

Wilkinson's principal complaint in Count III is that he did not receive any of the performance evaluations to which he claims he was entitled under either manual. The evaluation procedures were primarily intended as precursors to salary decisions. Tr. at 60 (Dickerson). There is no dispute that Wilkinson did not receive a 90–day evaluation. *See, e.g.,* Tr. at 64. No evidence was introduced to suggest that Wilkinson objected to the absence of such an evaluation. With respect to an annual evaluation, Wilkinson's first anniversary date was September 5, 1990. On August 6, 1990, Dickerson sent Wilkinson the standard form given employees allowing them an opportunity to prepare a self-evaluation as part of the overall evaluation process. Pl.'s Ex. 15. The form indicates that the relevant paperwork had been sent to Wilkinson's "supervisor," who at that time was the LSC President. Two weeks later, the Board became Wilkinson's supervisor. *See* 55 Fed.Reg. 34101–02 (Aug. 21, 1990).

Prior to August 1990, the only LSC employee supervised directly by the Board had been the LSC President, who, like Wilkinson, was employed under a letter agreement with LSC. The Board did not conduct annual evaluations of the LSC President. Tr. at 151–52 (Dickerson). After receiving supervisory responsibility for the Inspector General, the Board also did not conduct an annual evaluation of Wilkinson. Under Wilkinson's Draft MOU, he did not consider such an evaluation mandatory. *See* Tr. at 103–05 (Wilkinson).

Wilkinson prepared a separate two-page draft MOU for the Board concerning its supervision of the Inspector General. Tr. at 102. That MOU contemplates an annual evaluation as optional. Def.'s Ex. 8 (Draft MOU) at II–1, II–2 ("[A]n annual personal [sic] evaluation review (*if required by the Board*) will be conducted by the Board annually on or about the inspector general's employment anniversary....") (emphasis added). Indeed, in a "comment" introducing the MOU, Wilkinson acknowledged having received the evaluation form from Dickerson and noted that "I am in no rush since there seems little reason to pursue an evaluation rating if it is not tied close in time to a possible raise." *Id.* at II–1. Wilkinson considered himself to be a "contract employee" who did not fit neatly into the annual evaluation/salary review scheme, *id.;* in fact, Wilkinson received two raises without a performance evaluation having been conducted. *See* Pl.'s Exs. 24–Q, 24–R (Official Personnel Action forms).

In its role as supervisor, the Board did not provide notice and an opportunity to participate in a performance improvement plan when it was displeased with the performance of an LSC President. Tr. at 152–54 (Dickerson). Rather the Board would fire the LSC President, sometimes before the end of the contract period. *See id.* Executive turnover was not uncommon; LSC Presidents Wear and Martin were both let go by the Board. As with LSC Presidents, the Board did not consider itself obliged to give Wilkinson an opportunity to participate in a performance evaluation plan. Tr. at 197 (Dana) ("[T]his was not a place for on-the-job training.").

In sum, LSC did not provide Wilkinson with a 90–day or an annual evaluation. Wilkinson never raised the issue of the 90–day

---

16. *See* Def.'s Ex. 8 (Draft MOU) at I–1 ("The OIG agrees to be subject to the provisions in the LSC Personnel Manual (March 1990) noted below, notwithstanding that they have not been enacted as laws or promulgated as regulations.").

evaluation, and was in "no rush" to have the annual evaluation conducted. From his constant run-ins with LSC staff, and his strained relations with the Board, Wilkinson was well aware that his performance was not universally well regarded. He was not offered an opportunity to participate in a performance improvement plan, nor did he seek such an opportunity. The Board's February 1991 decision not to exercise its option to retain Wilkinson's services for another year came as a surprise to no one. In Wilkinson's own view, LSC was not bound by the 1990 Manual, *see* Tr. at 92–93 (Wilkinson), and when he sued LSC in April 1991, he raised no issue about LSC's procedural non-compliance. His procedural non-compliance issue was first raised in August 1991, when he amended his complaint. After doing so he limited his claims to the 90–day evaluation, the 1990 annual evaluation, and the performance improvement plan; he expressly waived any right to have an annual evaluation for 1991, which would have been a "sham." Tr. at 114 (Wilkinson).

### III.

On summary judgment, and again at trial, LSC argued that it is entitled to judgment as a matter of law on Count III because, even if Wilkinson had been entitled to the procedures he claims he was denied, LSC cannot be sued under the Due Process Clause or the *Accardi* doctrine. *See* Tr. at 125, 2–37. In *Wilkinson I,* this Court did not reach Count III because of the decision on Count II. 865 F.Supp. at 902. When the Court of Appeals remanded for consideration of Count III, it made no implicit holding that Wilkinson was entitled to proceed on the claim. *See Wilkinson II,* 80 F.3d at 539. Thus no law of the case prevents the Court from granting LSC judgment as a matter of law. Nonetheless, upon careful consideration of these novel issues, the Court concludes that Wilkinson was not precluded by law from pursuing his claims. This section explains why Wilkinson may proceed on what the Court has construed as his Due Process claim and why the facts do not support that claim.

### A. The Due Process Clause Applies to the Legal Services Corporation

■ As with any claim based on the federal Constitution, a threshold issue concerning Wilkinson's Due Process claim is whether the claim has been brought against the Government or an equivalent "state actor," because constitutional norms "erect[ ] no shield against merely private conduct ..." *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

Because LSC is a creature of Congress and the President, *see Wilkinson I,* 865 F.Supp. at 901 (discussing legislative history of LSC Act), initial consideration must be given to whether Congress intended LSC to be treated as part of the Government for constitutional purposes. The LSC Act provides in pertinent part that "[e]xcept as otherwise specifically provided in this subchapter ... the Corporation shall not be considered a department, agency, or instrumentality, of the Federal Government." 42 U.S.C. § 2996d(e)(1). Congress has "specifically provided" that LSC be treated as part of the Government in a number of significant respects: Board meetings must comply with the Government in the Sunshine Act, *see* 42 U.S.C. § 2996c(g); LSC records must be disclosed pursuant to the Freedom of Information Act, *id.* § 2996d(g); LSC employees are entitled to certain government benefits, 42 U.S.C. § 2996d(f); LSC must publish its regulations in the Federal Register, *id.* § 2996g(e); and LSC must employ an Inspector General, 5 U.S.C.App. 3 § 8G.

Absent from this list, however, is a provision requiring LSC to comply with the Constitution. Instead, Congress directed that in all other respects LSC should be treated as a private, non-profit corporation. *See* 42 U.S.C. §§ 2996b(c), 2996e(a), 2996i(c). From the text of the statute, it is evident that Congress did not intend LSC to be a state actor for constitutional purposes. The legislative history also evidences this intent. *See* H.R.Rep. No. 247, 93d Cong., 1st Sess. (1973) *reprinted in* 1974 U.S.C.C.A.N. 3872, 3873. Other courts have come to the same conclusion. *E.g., Newman v. Legal Services Corp.,* 628 F.Supp. 535, 541–42 (D.D.C.1986); *Spo-*

kane County Legal Services, Inc. v. Legal Services Corp., 433 F.Supp. 278, 280–81 (E.D.Wash.1977).

However, it is not for Congress to make the final determination of LSC's status as a government entity for purposes of determining the constitutional rights of citizens affected by its actions. *See Lebron v. National RR Passenger Corp.*, 513 U.S. 374, 392, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995).[17] Instead, courts must determine whether a government-created "private" corporation is part of the Government for constitutional purposes by examining the corporation's purpose, activities, board composition, financing, and its overall relationship to the federal government. *Id.* at 397–99, 115 S.Ct. 961. The *Lebron* Court held that "where ... the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 400, 115 S.Ct. 961.

All of the factors that led the Court to consider Amtrak a state actor apply with equal, if not greater, force to LSC. Congress created LSC to fulfill an important governmental objective by providing legal services in noncriminal matters to the underprivileged. *See* 42 U.S.C. § 2996. Unlike Amtrak, which has some privately-appointed Directors, LSC's Board is composed entirely of political appointees, *id.* § 2996c(a), and LSC's funding is almost entirely made up of federal appropriations. *Id.* § 2996i. From the reasoning and holding of *Lebron*, there is no question that LSC is a state actor for purposes of the Fifth Amendment's Due Process Clause. *Cf. Texas Rural Legal Aid, Inc. v. Legal Services Corp.*, 940 F.2d 685, 699 (D.C.Cir.1991) (LSC is state actor when

it issues regulations pursuant to LSC Act); *Legal Aid Soc'y of Hawaii v. Legal Services Corp.*, 961 F.Supp. 1402, 1408 n. 4 (D.Haw. 1997) (same). LSC may be sued for violating the Due Process Clause. To the extent that *Newman* and *Spokane County* indicate otherwise, they have been implicitly overruled.

**B. The Evidence Does Not Support Wilkinson's Due Process Claim**

■ The Fifth Amendment's Due Process Clause provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law...." U.S. CONST. amend. V. This majestic provision has been invoked to correct a broad range of governmental missteps—from the shocking to the banal. The inquiry under the Clause comes in two parts: (1) has the plaintiff been deprived of an interest protected by the Clause?; and if so, (2) was the plaintiff afforded the process due with respect to that deprivation? *See Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120 (1997).

■ Under the first inquiry, the broad contours of the Due Process Clause have been given more specific definition with respect to public employment. A government employee can be said to have a "property" interest in continued employment where applicable laws, regulations, contracts or customs limit the government's ability to terminate that employment, except upon the happening of certain events, such as termination for "cause." *E.g., Gilbert*, 117 S.Ct. at 1811–12; *Mazaleski v. Treusdell*, 562 F.2d 701, 711 n. 23 (D.C.Cir.1977). These limitations give rise to a legitimate entitlement to continued employment, and it is that entitlement that is the protected "property" that can be taken away only if the process due is afforded.[18] In this case,

---

**17.** *Lebron* involved a First Amendment challenge to Amtrak's decision to prevent a politically provocative advertisement from being displayed at Pennsylvania Station in New York City. The Court considered the history of government corporations, and mentioned the disclaimer of governmental identity in the LSC Act in connection with its discussion of the nearly identically-worded section of Amtrak's organic statute, the Rail Passenger Service Act of 1970, codified at 45 U.S.C. § 541. *See Lebron*, 513 U.S. at 391, 115

S.Ct. 961. The Court concluded that although Congress could not finally determine Amtrak's constitutional status, with respect to those matters within the control of Congress, its determination that Amtrak was "private" would be given effect. *Id.* at 392, 115 S.Ct. 961.

**18.** A second line of analysis considers whether an employee has a "liberty" interest that is affected by a termination decision if such decision will "seriously harm his standing in the commu-

three potential limitations could have given Wilkinson a property interest in continued employment: the LSC Act, his employment contract, or binding LSC personnel regulations.

The LSC Act plainly states that officers of the corporation, such as Wilkinson, "shall serve at the pleasure of the Board." 42 U.S.C. § 2996d(a). This language creates no property interest in continued employment.[19] Similarly, Wilkinson's employment contract provides that it will not renew if either party gives notice of non-renewal six months prior to the end of the initial two-year term. See Def.'s Ex. 2 ¶ 6. Where, as here, notice was given within the time prescribed, no entitlement to continued employment arose under the terms of the contract.

For those reasons, Wilkinson concentrated at trial on arguing that LSC's personnel manual set forth binding regulations, which provided that he could keep his position unless dismissed for cause. Specifically, Wilkinson argued that the 1978 Manual guaranteed that LSC employees would be dismissed only for cause. See Tr. at 20, 2–32, 2–33.[20] Although the Board did not formally ratify the 1978 Manual, a committee of Board members had reviewed it and generally approved. Wilkinson argues that the Board's informal review of the 1978 Manual amounts to a fundamental policy choice to depart from the broad discretion given it to be an employer-at-will by the LSC Act. In Wilkinson's view, the 1978 Manual was intended to be binding upon LSC and to provide its employees with substantially more job security than that provided by the LSC Act. The argument continues that the 1990 Manual, which states in its introduction that none of the provisions in it confer any rights upon LSC employees and which openly declares that LSC is an employer-at-will, is a nullity because the Board did not approve the fundamental policy choice to return to an employment-at-will regime. At each step of his argument, the facts do not bear him out.

Wilkinson's initial premise is erroneous. None of the exhibits from 1978, which Wilkinson introduced without sponsoring testi-

---

nity or foreclose his future opportunities for reemployment." Mazaleski, 562 F.2d at 712. For fairly obvious reasons, Wilkinson did not introduce any evidence or argument to suggest that LSC had deprived him of a "liberty" interest. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 575, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("it stretches the concept too far to suggest that a person is deprived of 'liberty' when he is simply not rehired at one job but remains as free as before to seek another.").

19. See, e.g. Mazaleski, 562 F.2d at 711 n. 23 ("One who may be discharged 'at the pleasure' of another ... simply has no property right to continued employment.") (internal quotation omitted). Even if Wilkinson were somehow an employee other than an officer, he would have no property interest under the Act, which provides that such employees can be discharged as the LSC President determines to be necessary. 42 U.S.C. § 2996d(b)(1).

Potentially, this would end the analysis. The Act directs that officers "shall" serve at the pleasure of the Board. Congress may have meant that officers must be employed at will and that LSC was not delegated the authority to create limitations on its dismissal power such that its employees would enjoy a property interest in their jobs. Cf. Sims v. Fox, 505 F.2d 857, 862 (5th Cir.1974) (en banc). Some considerations would favor such a reading because the presence of job protections provides incentive for the impermissible but well-known Washington practice of "leaping" or "burrowing" by which political appointees with no job security seek to convert themselves into protected civil servants by switching jobs at the end of their administration's tenure. See Mike Causey, See How They Leap and Burrow, Wash. Post., Mar. 17, 1996, at B2.

Nonetheless, Congress has frequently employed language granting an agency full discretion to discharge its employees, and such language is routinely interpreted to mean that the agency has been given the flexibility to remain an employer at will or to create additional job security for its employees as it sees fit. See, e.g., Service v. Dulles, 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Mazaleski, 562 F.2d at 711 n. 23.

20. Wilkinson did not formally invoke the Due Process Clause to support this claim, however, liberally construed, his argument that he could only have been terminated for cause translates into an argument that he had a property interest in continued employment of which he was unlawfully deprived. Wilkinson's counsel was not fully committed to this argument because on summary judgment, and elsewhere at trial, see Tr. at 25, he appeared to have conceded that LSC could have chosen not to renew Wilkinson's contract for any reason or no reason at all, but that it had nevertheless obligated itself to go through the motions of evaluating his job performance.

mony, reflect that the Board decided to depart from the statutory employment-at-will scheme, and those exhibits make plain that Board approval was not required for the personnel manual, and any subsequent revisions and amendments thereto, to take effect.

Moreover, the text of the 1978 Manual hardly provides clear evidence of such an intent; in fact, the 1978 Manual is an ambiguous muddle, as LSC personnel have recognized.[21] Although the 1978 Manual's termination section sets forth four categories of terminations, the severance section suggests a broader range of terminations that include reasons such as "an irreconcilable personality conflict that interferes with achievement of departmental goals or operations"—a provision that clearly describes one of the Board's reasons for not renewing Wilkinson's contract—and a termination where the incumbent lacks certain skills or characteristics. Pl.'s Ex. 9 at III–19.

Nor is there any evidence that LSC's employment practices under the 1978 Manual reflected a policy of terminations only for cause. Having reviewed the evidence and judged the credibility of the witnesses, the Court fully credits Ms. Dickerson's testimony that LSC has been an employer-at-will throughout its history, that the 1990 Manual clarified that fact, and that the 1990 Manual took effect in March 1990. *See* Tr. at 136–41; *cf. Newman*, 628 F.Supp. at 538 (1978 Manual does not rebut presumption of employment-at-will).

In any event, the Court rejects Wilkinson's argument that no conflict arises between his employment agreement and his assertion that the 1978 Manual required cause before termination. Even if either version of LSC's personnel manual provided for termination only for cause, such a provision would have been directly inconsistent with the language and intent of Wilkinson's written employment agreement. The specific terms of the letter agreement, Def.'s Ex. 2, which preserves LSC's unfettered "option" to renew the agreement, override any contrary provisions of the personnel manual.

■ Wilkinson had no property interest in continued employment because neither the LSC Act, Wilkinson's employment contract, nor LSC's personnel manual set forth limitations on LSC's discretion not to renew his contract. When the Board deliberated on the matter and timely notified Wilkinson that it did not wish to continue his service as IG, Wilkinson received all the process he was due.

## IV.

Recognizing the weakness of his Due Process claim, Wilkinson argues in the alternative that even if he had no legitimate expectation of continued employment because LSC could choose not to renew his contract for any reason, LSC had nonetheless committed itself in both the 1978 and the 1990 Manuals to give him a 90–day evaluation, annual performance evaluations, and an opportunity for him to participate in a performance improvement plan. He claims that he is entitled to a substantial monetary recovery because LSC failed to provide him with any of these job evaluations before choosing not to renew his contract.

The legal basis for this argument is the so-called *Accardi* doctrine, which states the general principle that a *public agency* "must adhere to voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822 F.2d 97, 100 (D.C.Cir.1987). As with the Due Process claim, LSC argues that the *Accardi* doctrine does not apply to it because LSC is not a public agency. The discussion of *Lebron* above establishes that this argument must be accepted if a claim based on the *Accardi* doctrine is subconstitutional and within Congress's control. On the other hand, if the *Accardi* doctrine represents a distinct branch of the Due Process Clause, the argument fails for the reasons already discussed. This section examines the source of the *Accardi* doctrine.

---

21. *See* Pl.'s Ex. 29 (Apr. 23, 1993 Mem. from LSC Gen. Counsel to LSC Board) at 4–5 ("some LSC employees may be in a position to argue that the terms of the 1978 manual at least raise factual questions as to whether their LSC employment is at-will."). LSC sought to exclude this exhibit from evidence, but its relevance argument goes to weight rather than admissibility. The parties briefed the issue, and the Court has decided to admit Exhibit 29 into evidence.

48

Identifying the legal source for the Supreme Court's pronouncement that government agencies are bound to follow their own rules is no simple matter.[22] This may be due, in part, to the fact that some of the earlier cases announcing the doctrine involved violations of agency rules where an individual was threatened with the deprivation of an interest protected by the Due Process Clause. The Court subsequently clarified that, under the doctrine, a person adversely affected by an agency's violation of its own rules could seek judicial review, even when no protected interest has been implicated. *See Service v. Dulles*, 354 U.S. 363, 388–89, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). The task of unearthing the *Accardi* doctrine's source requires dusting off and combing through Supreme Court precedents reaching back over 100 years, and more recent decisions from our Court of Appeals.

As will be seen, the Supreme Court's limited commentary on the source of its authority to exercise judicial review of agency action under the *Accardi* doctrine is divided. On one view, procedural rules confer procedural rights, and even if these procedural rights are not "property" protected by the Due Process Clause, the Clause still authorizes judicial review to remedy injury caused to an individual by an agency's violation of its procedural rules. Another view recognizes the value of procedural regularity but rejects it as a constitutional value, at least when applied to an agency's compliance with self-imposed procedural rules. On this view, the *Accardi* doctrine reflects an extension of common law "administrative law" review of agency action that apparently was not supplanted by passage of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and its comprehensive judicial review provisions.

Upon reflection, and having carefully reviewed this line of precedent, this Court concludes that the opposing views can be harmonized and reconciled. The *Accardi* doctrine is a hybrid. The requirement that agencies are bound by their own rules reflects the broader principle, found in the Due Process Clause, that government officials are bound by the rule of law. The constitutional rule-of-law provision reflects a founding principle of this Republic, one that is implicated every time the Government is sued for violating the law. If public officials were not bound by law, such suits would not be judicially cognizable. But the principle does not turn every public official's violation of subconstitutional law, be that statute, regulation or binding practice, into a constitutional violation. With the rule-of-law principle in place, a suit against a public official for violation of law arises under the specific law alleged to have been violated and not the general rule-of-law principle. Consequently, jurisdiction to hear such claims is determined by the law under which the suit arises. If the rule-of-law principle creates any directly enforceable federal right, it is a right to judicial review of agency action in some circumstances.[23] The facts of this case, however, do not require further elucidation of the contours of such a right.

**A. The Rise of the *Accardi* Doctrine**

**1. The Constitutional Stature of the Rule of Law**

In *United States v. Lee*, the Court forcefully expounded upon the fundamental character of the rule of law, and indicated that the Due Process Clause guarantees a right of judicial review to enforce the rule of law, at least for violations of law that lead to the deprivation of life, liberty or property. 106

---

**22.** *Accord* Joshua I. Schwartz, *The Irresistible Force Meets The Immovable Object: Estoppel Remedies For An Agency's Violations Of Its Own Regulations Or Other Misconduct*, 44 Admin.L.Rev. 653, 671 (1992) (the Supreme Court's opinions are "remarkably unhelpful in identifying the doctrinal basis" for the rule); Rodney A. Smolla, *The Erosion Of The Principle That The Government Must Follow Self-Imposed Rules*, 52 Fordham L.Rev. 472, 476 (1984) ("[T]here is no clear explication of the source of law from which the doctrine is derived.").

**23.** For example, if a State were to enact a provision permitting its agents to disregard state law or a provision foreclosing judicial review in the state courts of state agencies' violations of their own rules, potentially a federal court would be available to review such legislation under the *Accardi* doctrine. But so long as a state court is available to review state agencies' violations of self-imposed rules, the constitutional element of the *Accardi* doctrine is satisfied.

U.S. 196, 220–21, 1 S.Ct. 240, 27 L.Ed. 171 (1882).[24] According to the Court:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

*Id.* at 220, 1 S.Ct. 240. While not directly addressing the positive law source of this restriction, in context, the Court unmistakably relied on the Fifth Amendment's Due Process Clause. The Court also found implicit in the Clause a right to judicial review of violations thereof. *Id.* at 221–22, 1 S.Ct. 240. Responding to a now-familiar objection to judicial review, the Court proclaimed:

> The evils supposed to grow out of the possible interference of judicial action with the exercise of powers of the government essential to some of its most important operations will be seen to be small indeed compared to this evil . . . [referring to the evil of allowing property to be taken by

government without a judicial remedy being available].

*Id.* at 221, 1 S.Ct. 240.

### 2. Agency Regulations Are Subject to the Rule–of–Law Principle

Forty years later, the grand principle was articulated in the agency context in *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923). *Bilokumsky* involved an alien facing deportation who challenged the legality of his custody alleging that the evidence introduced at his deportation hearing was procured in violation of the Fourth Amendment and the rules of procedure for such hearings established by the Secretary of Labor. The Court assumed that "one under investigation with a view to deportation is legally entitled to insist upon the observance of rules promulgated by the Secretary pursuant to law," but concluded that no such violation had occurred. *Id.* at 155, 44 S.Ct. 54 (footnote omitted).[25]

Shortly thereafter, the seeds of the modern *Accardi* doctrine appeared in the Court's recognition that an agency's adjudicative decision could be set aside if it conflicted with the agency's own legislative rules. *See Arizona Grocery Co. v. Atchison, T. & S.F. Ry. Co.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932).[26] The Court held that where the ICC

---

**24.** In *Lee,* the former owners of the land comprising Arlington National Cemetery sued agents of the United States in Virginia state court seeking to eject the United States from the land. 106 U.S. at 196–97. Years prior, the United States had purchased the land at a tax sale. In the Virginia court, the United States argued that as the sovereign owner of the land, it was immune from an action for ejectment. A divided Supreme Court held that while the United States itself had not waived immunity, its officers were amenable to suit to determine the rightfulness of the United States' occupation of the land. *Id.* at 222–23.

**25.** The Court's assumption rested on the holdings of three circuits that failure to comply with the Secretary's procedural rules had rendered deportation hearings unfair. *See Sibray v. United States,* 282 F. 795, 797 (3d Cir.1922) (holding that " 'if it appears that the procedure prescribed by law for the determination of the facts on which the [deportation] order is based was disregarded, and the respondent did not have a fair hearing in accordance with the rules of the department,' the District Court could review the decision"); *Mah Shee v. White,* 242 F. 868, 871–

72 (9th Cir.1917) (holding that Labor Department's procedural rule that immigrant could submit additional evidence was violated when immigrant was denied opportunity to consult with counsel for such purposes rendered hearing unfair "according to the law and the regulations of the department."); *Whitfield v. Hanges,* 222 F. 745, 749–50 (8th Cir.1915) (holding that various violations of Labor Department's rules rendered deportation hearing unfair).

**26.** Signaling the emergence of the modern administrative state, the *Arizona Grocery* majority recognized the Interstate Commerce Commission's (ICC) power to act in both a quasi-legislative and quasi-judicial capacity, but announced the principle that when acting in its judicial capacity, the agency was bound by its legislative rules. Initially the ICC only had the power to act judicially by declaring certain rates charged by interstate carriers to be unreasonable. *Id.* at 385, 52 S.Ct. 183. Congress then delegated to the ICC the power to prospectively declare rates within a given range to be reasonable. *Id.* at 385–86, 52 S.Ct. 183. After having established such a range, the ICC subsequently decided that

has made an order regarding the reasonableness of interstate shipping rates that has prospective effect, "it may not in a subsequent proceeding, acting in its quasi judicial capacity, ignore its own pronouncement promulgated in its quasi legislative capacity...." *Id.* at 389, 52 S.Ct. 183. The Court reiterated that the agency was "bound to recognize the validity of the rule of conduct prescribed by it," but the Court neglected to mention whether it was the Due Process Clause or a principle of administrative law that made such rules binding upon the agency. *See id.*

### 3. *Accardi* Emerges

In *Bridges v. Wixon,* 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), the Court both strengthened and qualified the doctrine: the Court reinforced *Bilokumsky's* assumption that an alien's deportation could be contrary to law if based on the agency's violation of its own rules, but it also suggested that judicial review of a procedural non-compliance claim can be waived if not raised before the agency.[27] Finding that review had been preserved, the Court appeared unwilling to hold that a violation of the agency's procedures alone justified issuing the writ. Instead, the Court went on to imply strongly that in light of petitioner's substantial liberty interest, the procedural violation would have independently denied petitioner due process, notwithstanding the civil nature of the deportation proceeding and the more relaxed rules of

evidence applicable in administrative hearings. *Id.* at 152–56, 65 S.Ct. 1443.

■ Then, in *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), the Court took the step it had refrained from taking in *Bridges* by recognizing that a right to judicial review extends to those adversely affected by an agency's violation of "gratuitous" regulations.[28] In *Accardi,* unlike in *Bilokumsky* and *Bridges,* the petitioner was admittedly deportable. Accardi's complaint on habeas was that INS regulations "with the force and effect of law," *id.* at 265, 74 S.Ct. 499, gave the Board of Immigration Appeals discretion to grant him a waiver of deportation, and the Board failed to exercise that discretion when it denied him a waiver because the Attorney General had designated him as one of 100 "unsavory characters" that should be deported. *Id.* at 266–67, 74 S.Ct. 499. The Court agreed, finding that "the regulations delegate to the Board discretionary authority as broad as the statute confers on the Attorney General," *id.* at 266, 74 S.Ct. 499, and reversed because "we object to the Board's alleged failure to exercise its own discretion, contrary to existing valid regulations." *Id.* at 268, 74 S.Ct. 499.

Having apparently clarified that judicial review was available for agencies' violations of gratuitous rules, the Court then obscured its reasons for doing so. The Court considered the gratuitous regulations to have conferred on Accardi a procedural "right" to have the Board exercise its independent discretion in making that decision.[29] The Court

---

certain rates charged within that range had been unreasonable.

**27.** In *Bridges,* the petitioner, a prominent labor organizer alleged to have been unlawfully affiliated with the Communist Party, sought a writ of habeas corpus on the grounds that the Immigration and Naturalization Service (INS) had violated its procedural rules by relying on prehearing, unsworn statements as substantive evidence supporting deportability. Before the Court, the Government conceded the procedural violation but asserted that the issue had not been preserved for appeal. *Bridges,* 326 U.S. at 151–52, 65 S.Ct. 1443.

**28.** A "gratuitous" regulation is a self-imposed binding substantive or procedural rule that limits an agency's discretion, one that was not required by any constitutional or statutory provision.

**29.** It may be that because Accardi's liberty was ultimately at stake, the procedural "right" was itself a liberty or property interest unlawfully denied him. *But see Olim v. Wakinekona,* 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). The Court directed that on remand the Board exercise its independent discretion, "after a fair hearing, which is nothing more than what the regulations accord petitioner as a right." *Accardi,* 347 U.S. at 268, 74 S.Ct. 499. The footnote following this sentence cited generally to the *Bilokumsky* and *Bridges* cases, *id.* at 268 n. 8, 74 S.Ct. 499, without mentioning that in those cases the alleged procedural violations had resulted in an unlawful deprivation of liberty; whereas, in *Accardi* the alleged violation resulted in deprivation of a discretionary benefit.

cryptically concluded that even though the INS and the Attorney General retained the discretion to deny Accardi a waiver of deportation, "at least he will have been afforded that due process *required by the regulations* in such proceedings." *Id.* at 268, 74 S.Ct. 499 (emphasis added); *see also Graham v. Richmond*, 272 F.2d 517, 522 (D.C.Cir.1959) (same).

**B. The High Water Mark of the *Accardi* Doctrine**

**1. Internal Personnel Regulations Are Subject to the Rule–of–Law Principle: *Service* and *Vitarelli***

In a pair of cases applying the doctrine in the employee-discharge context, the Court strengthened and broadened it, stating that *Accardi* had recognized a new source of judicial review for an agency's violation of its gratuitous regulations. *See Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). In both cases, government employees were discharged on security or loyalty grounds stemming from vague allegations that each was a Communist sympathizer.[30] Though public servants, neither employee could claim to have a "property" or "liberty" interest in

continued employment, even under modern understandings of due process.[31] To guard against abuse of the immense discretion conferred on the State Department and the Department of the Interior, both agencies were subject to procedural regulations governing security and loyalty discharges.[32] Relying only on the *Accardi* doctrine, the Court in both cases determined that the gratuitous regulations gave rise to a right to judicial review. In *Service*, judicial review was implicitly made available by *Accardi*, under which

> regulations validly prescribed by a government administrator are binding upon him as well as the citizen, and that this principle holds even when the administrative action under review is discretionary in nature.

*Service*, 354 U.S. at 372, 77 S.Ct. 1152. The Court granted Service a remedy, finding that

> While it is of course true that under the McCarran Rider the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so ... and having done so he could not, so long as the Regulations remained

**30.** In *Service*, a Foreign Service Officer who had served in China for ten years, was discharged by the Department of State for alleged disloyalty. *Service*, 354 U.S. at 365, 77 S.Ct. 1152. Vitarelli had been an educator with a Ph.D., employed by the Department of Interior and posted in the federal Trust Territory in Micronesia, who was dismissed for allegedly having been in "sympathetic association" with three persons who were either members of, or themselves in "sympathetic association" with, the Communist Party. *Vitarelli*, 359 U.S. at 536–38, 79 S.Ct. 968.

**31.** In *Service*, Congress had abrogated any protected interest that Foreign Service Officers may have had in the so-called McCarran Rider, which provided that "[n]otwithstanding the provision of ... any other law, the Secretary of State may, in his absolute discretion, ... terminate the employment of any [Foreign Service Officer] whenever he shall deem such termination necessary or advisable in the interests of the United States." *Service*, 354 U.S. at 370 (quoting the McCarran Rider); *see also id.* at 370 n. 12, 77 S.Ct. 1152 (discussing effect of McCarran Rider on the substantive and procedural rights granted by the Foreign Service Act, 22 U.S.C. § 801 *et seq.*).

In *Vitarelli*, by both statute and regulation, the Secretary of Interior had unfettered discretion to summarily dismiss Vitarelli without any statement of reasons. *Vitarelli*, 359 U.S. at 538–39, 79 S.Ct. 968.

**32.** In *Service*, the Secretary of State had limited his "absolute discretion" under the McCarran Rider by requiring that the Department follow certain procedures before discharging a Foreign Service Officer under its authority. *Service*, 354 U.S. at 373–381, 77 S.Ct. 1152. In *Vitarelli*, the letter of dismissal stated that the decision was "in the interest of national security." *Vitarelli*, 359 U.S. at 537, 79 S.Ct. 968. By choosing to articulate a national security reason, the Secretary brought his termination decision under an Executive Order that imposed certain procedural requirements for discharges on the basis of national security. *Id.* at 539–40, 79 S.Ct. 968.

Anticipating an issue that would arise again, the Court in *Service* rejected the holdings in this District Court and our Court of Appeals that the Secretary lacked the authority to impose binding rules that would limit the discretion delegated by Congress in the McCarran Rider. *Service*, 354 U.S. at 379 & n. 23, 380, 77 S.Ct. 1152.

unchanged, proceed without regard to them.

*Id.* at 388, 77 S.Ct. 1152. While the Court had clarified that judicial review was available over such procedural violations, left unmentioned was the source of law requiring procedural regularity or authorizing judicial review.

*Vitarelli* is nearly as recondite. Although Vitarelli had no protected interest in keeping his job, the Court nonetheless exercised review because Vitarelli's "procedural rights under the applicable regulations were violated in at least three material respects...." *Vitarelli*, 359 U.S. at 540, 79 S.Ct. 968. The Court reinstated Vitarelli, recognizing that the Secretary could promptly dismiss him upon reinstatement.[33] In the first comment on the *Accardi* doctrine's source, Justice Frankfurter's partial concurrence characterized the doctrine as a "judicially evolved rule of administrative law" requiring that "he who takes the procedural sword shall perish with that sword." *Vitarelli*, 359 U.S. at 546–47, 79 S.Ct. 968 (Frankfurter, J., concurring in part and dissenting in part).

A somewhat perplexing aspect of *Service* and *Vitarelli* is the Supreme Court's sole reliance on *Accardi*, even though the Administrative Procedure Act of 1946 ("APA"), 5 U.S.C. § 551 *et seq.*, had been law for more than 10 years. The APA imposes a series of procedural requirements on government agencies and explicitly provides for judicial review of agency action that is "contrary to law." 5 U.S.C. § 706(2)(A). Apparently, the complaints in both cases sought judicial review under the APA. *See United States v. Caceres*, 440 U.S. 741, 754 & n. 19, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Nonetheless, the Court in both cases eschewed reliance on the statute altogether. *See also Geiger v. Brown*, 419 F.2d 714, 718 (D.C.Cir.1969) (relying on *Accardi* ); *Coleman v. Brucker*, 257 F.2d 661, 662–63 (D.C.Cir.1958) (same).

### 2. Congress is Bound By Its Rules As Well

Whatever the appeal of Justice Frankfurter's characterization of the doctrine as one of "administrative law," the Court subsequently made clear that the *Accardi* doctrine has deeper roots and broader application because it also applies to Congress. *See Yellin v. United States*, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); *cf.* 5 U.S.C. § 701(b)(1)(A) (Congress is not a government agency subject to judicial review under the Administrative Procedure Act). In *Yellin*, the Court held that the House Committee on Un–American Activities had violated its procedural rules in its treatment of a witness's request to appear in executive session rather than in a public hearing. *Yellin* recognized a defense to prosecution for contempt of Congress based on a congressional violation of self-imposed rules. *Id.* at 123–24, 83 S.Ct. 1828; *cf. Christoffel v. United States*, 338 U.S. 84, 89–90, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949) (overturning perjury conviction for failure of proof as to one element—a competent tribunal—due to absence of evidence that a quorum of congressional committee members was present, as required by committee rules, at time of testimony).

### 3. The *Accardi* Doctrine's Defining Features

The precedents through *Yellin* established a doctrine with a number of common features. In each case, the Court inquired into the purpose of the regulations that the agency allegedly violated, and found that the party relying on the *Accardi* doctrine was in the class of persons for whose benefit the regulations had been promulgated. *See Yellin*, 374 U.S. at 115, 83 S.Ct. 1828; *Vitarelli*, 359 U.S. at 540, 79 S.Ct. 968; *Service*, 354 U.S. at 373, 77 S.Ct. 1152; *Accardi*, 347 U.S. at 268, 74 S.Ct. 499; *Bridges*, 326 U.S. at 152, 65 S.Ct.

---

**33.** By resting its holding on the procedural violation, the Court explicitly avoided the question of whether an employment-discharge hearing based on submissions from unidentified "confidential informants" violated the Constitution. *Vitarelli*, 359 U.S. at 540 & n. 2, 79 S.Ct. 968. Justice Frankfurter, writing for himself and three colleagues, agreed that the agency's procedural regulations had been violated but disagreed with the remedy, finding that the Secretary had cured the defect in the District Court by issuing a revised letter of dismissal that gave no reason for the dismissal. *Id.* at 548–49, 79 S.Ct. 968 (Frankfurter, J., concurring in part and dissenting in part).

1443; *Arizona Grocery*, 284 U.S. at 389, 52 S.Ct. 183; *Bilokumsky*, 263 U.S. at 155–56, 44 S.Ct. 54.

The purpose for inquiring into the goal of the regulations appears to have been to support a finding that the regulation conferred a procedural "right" on the individual that had been denied by the violation. *See also Mazaleski*, 562 F.2d at 719. The Court explicitly or implicitly found that the individual raising the procedural non-compliance claim had been at least arguably harmed by the violation. The Court's analysis also suggests that the doctrine functions to ensure equal treatment by governmental bodies, particularly where the agency has extended a procedural protection on a class of person. For this reason, the Court, on occasion, stated that strict compliance with the regulation was required. *See Yellin*, 374 U.S. at 124, 83 S.Ct. 1828 (committee need be "equally meticulous in obeying its own rules"); *Vitarelli*, 359 U.S. at 540, 79 S.Ct. 968 ("scrupulous observance of departmental procedural safeguards is clearly of particular importance"); *id.* at 546–47, 79 S.Ct. 968 (Frankfurter, J., concurring in part and dissenting in part) (same).

## C. Limitations on *Accardi*'s Rule-of-Law Principle

### 1. The Prejudice, Harmless Error, and Finality

The Court soon retreated from its "strict compliance" standard, and announced an exception by which agencies may violate those "internal" rules not intended to protect a class of persons, at least where the violation was harmless. *See American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970).[34] The Court pronounced that:

> it is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party.

*Id.* at 539, 90 S.Ct. 1288.[35] Under this formulation, even when a complaining party is not the intended beneficiary of a regulation, judicial review is available if the agency's non-compliance causes substantial prejudice to the complaining party's interests. Although the Court's choice of language focused on what liberties agencies may take with their own rules, the thrust of its analysis focused on when an agency's violation of its procedural rules would not call for a judicial remedy because the error was harmless. *See American Farm Lines*, 397 U.S. at 537–38, 542, 90 S.Ct. 1288.

Four years later, in *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), the Court reiterated the importance of the prejudice inquiry. *Ruiz* is the first case in this line to even mention the APA, but like its predecessors, it did not rely on the statute.[36] While *Service* and *Vitarelli*

---

**34.** In *American Farm Lines*, the ICC had statutory authority to grant temporary operating authority to motor carriers to satisfy an immediate and urgent need for transportation service. The ICC promulgated regulations required that an applicant for such authority support its application with statements from its customers demonstrating that currently authorized carriers could not meet their needs. The ICC had granted American Farm Lines temporary authority on the basis of a statement from its customer, the Department of Defense, that did not demonstrate need in conformity with the regulations. The ICC argued that it had substantially complied with its rules, but neither the majority nor the dissent accepted this view. *See American Farm Lines*, 397 U.S. at 537–38, 90 S.Ct. 1288; *id.* at 546–47 & n. 2, 90 S.Ct. 1288 (Brennan, J., dissenting).

**35.** For this proposition, the Court relied in part on *McKenna v. Seaton*, 259 F.2d 780 (D.C.Cir. 1958), in which our Court of Appeals upheld a Department of Interior decision favoring one of two applicants for a license in alleged violation of its rules. *McKenna*, however, is better understood as affording deference to the agency's interpretation of its own regulations rather than authorizing occasional violations thereof. *See, e.g., Miller v. Udall*, 349 F.2d 193, 194 & n. 2 (D.C.Cir.1965); *Safarik v. Udall*, 304 F.2d 944, 950 & n. 6 (D.C.Cir.1962); *cf. Roberts v. Vance*, 343 F.2d 236, 240 (D.C.Cir.1964) (Burger, J., concurring) (requiring procedural regularity unless it would impose an "undue hardship" on the agency).

**36.** Ruiz was an Indian denied general assistance benefits by the Bureau of Indian Affairs (BIA) on the ground that he ·did not live "on" a reserva-

imposed an unqualified obligation on agencies to follow their own rules, the *Ruiz* Court's formulation of the *Accardi* doctrine implicitly included the harmless error provision:

> *Where the rights of individuals are affected,* it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required [citing *Service* and *Vitarelli* ].

*Id.* at 235, 94 S.Ct. 1055 (emphasis added); *see also Doe v. Hampton,* 566 F.2d 265, 280 (D.C.Cir.1977). Finding that the agency had violated its unpublished rule governing publication, the Court determined that

> it is essential that the legitimate expectation of these needy Indians not be extinguished by what amounts to an unpublished ad hoc determination of the agency that was not promulgated in accordance with its own procedures, to say nothing of those of the Administrative Procedure Act.

*Id.* at 236.[37]

The Court in *Ruiz* again declined to specify the source of the principle that agencies must follow their rules and that procedural violations are subject to judicial review. Also in 1974, the Supreme Court reaffirmed the basic *Accardi* holding that even a gratuitous regulation has the force of law and is binding on the executive, *see United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), but held that the District Courts are without authority to stay an administrative action likely to violate a regulation where the administrative decision has not become final. *See Sampson v. Murray,* 415 U.S. 61, 74, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("The authority of the District Court to review agency action under *Service* . . .

does not come into play until . . . the administrative decision to discharge an employee does in fact fail to conform to applicable regulations.").

## 2. Federalism Limitations on the *Accardi* Doctrine

In the mid–1970s, the Court faced *Accardi* claims appended to Due Process claims brought in federal court against state agencies. The Court made clear that an *Accardi* claim by itself was not rooted in the Fourteenth Amendment's Due Process Clause, meaning that a party could not seek judicial review in federal court of a state agency's violation of its self-imposed rules—at least where no property or liberty interest had been deprived. In the Court's words:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. . . . . [W]e must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

*Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) *overruled on other grounds by Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *see also Board of Curators of the University of Missouri v.*

---

**37.** Again, the Court did not rely on the APA as the authority for its review or as authority for its holding. The Court was clearly cognizant that it could have grounded its holding on the APA, *see id.* at 235, 94 S.Ct. 1055 (eligibility rule should have been published to have force and effect of law), but it chose to rest on a violation of an internal procedure that required compliance with the APA rather than the APA itself. *Id.* at 235–36, 94 S.Ct. 1055.

tion, as was required by the agency's unpublished, internal operations manual. In a lengthy exposition, the Court first established that Ruiz was statutorily entitled to receive benefits. *Ruiz,* 415 U.S. at 205–30, 94 S.Ct. 1055. The inquiry shifted to whether the BIA could reasonably rely on its unpublished provision in its manual to exclude him from eligibility. The Court held that it could not because a separate unpublished, internal rule required that directives governing eligibility be published in the Federal Register according to the Administrative Procedure Act (APA). *Id.* at 235–36, 94 S.Ct. 1055.

*Horowitz,* 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 55 L.Ed.2d 124 (1977):[38]

> As for the legal conclusion that respondent draws, both *Service* ..., and *Accardi* ..., upon which *Service* relied, enunciate principles of federal administrative law rather than of constitutional law binding upon the States.

However, in neither case did the Court share the reasoning leading to this conclusion. *But cf. Massachusetts Fair Share v. Law Enforcement Assistance Admin.,* 758 F.2d 708, 711 (D.C.Cir.1985) (*Accardi* doctrine "rooted in the concept of fair play and in abhorrence of unjust discrimination ...").

### 3. Congress's Control Over Judicial Review of *Accardi* Claims

Also in 1977, the Court appears to have held *sub silentio* that an *Accardi* claim is unreviewable where Congress has provided that an agency's discretionary decision is not subject to judicial review, even if the executive subsequently makes rules that limit that discretion. *See Morris v. Gressette,* 432 U.S. 491, 505–07, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977) (Attorney General's failure to object to state reapportionment plan under § 5 of the Voting Rights Act not subject to review); *see also id.* at 512–14, 97 S.Ct. 2411 (Marshall, J., dissenting) (demonstrating that Attorney General's failure to object violated 28 C.F.R. § 51.19 (1976) and arguing that such violation provided an independent basis for judicial review).

### 4. *Caceres:* The Doctrine Refined?

The Court refined the harmless error exception and the prejudice inquiry while leaving the source of the doctrine unmentioned in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). *Caceres* involved a clear *Accardi* doctrine predicate—

an agency, the IRS, had adopted gratuitous regulations requiring its agents to obtain authorization before tape-recording conversations between its agents and the target of an investigation. At his criminal trial for bribing an IRS agent, Caceres sought to suppress the Government's recordings of his conversations with the agent on the ground that authorization had not been obtained. The Government conceded the procedural violation but argued that suppression of relevant evidence was not an appropriate remedy. The Court agreed, relying principally on its assertion that Caceres had not relied on the IRS regulations for his guidance or benefit. This was because

> [A]ny inconsistency of which respondent complains is purely one of form, with no discernible effect in this case on the action taken by the agency and its treatment of respondent.

*Id.* at 752, 99 S.Ct. 1465.[39]

### 5. *Accardi* meets the APA: Whether Judicial Review of *Accardi* Claims for Non–Compliance with Gratuitous Procedural Regulations Is Permitted

In the Supreme Court's last substantive mention of the doctrine, it again faced a *Service*-type claim such as Wilkinson's, that is, an employee-discharge case involving an alleged failure to comply with gratuitous procedural rules. *See Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). The Court identified, but did not resolve, a potential inconsistency between its *Accardi* cases requiring agencies to abide by such rules and its interpretation of the APA, potentially rendering such violations unreviewable as committed to agency discretion by law.

---

**38.** In *Horowitz,* a medical student who had been dismissed from school alleged that she had been deprived of a liberty interest without due process and that the university had failed to follow its own evaluation procedures. In the footnote quoted above, the Court rejected the notion that the procedural non-compliance claim made out an independent constitutional violation.

**39.** In *dicta,* the Court suggested that its *Accardi* doctrine cases reflect the application of the APA. *See Caceres,* 440 U.S. at 753–54 & nn. 16–18, 99

S.Ct. 1465. *But see id.* at 757–58 & n. 1, 99 S.Ct. 1465 (Marshall, J., dissenting) ("Thus it is clear that this line of precedent cannot be dismissed as federal administrative law."). However, the Court undercut its own characterization by also suggesting that the Due Process Clause would be "implicated" where an intended beneficiary of a gratuitous regulation has "suffered substantially" by an agency's non-compliance. *Id.* at 752–53, 99 S.Ct. 1465.

In *Webster*, plaintiff had been a model employee of the Central Intelligence Agency (CIA), who was discharged after voluntarily revealing that he was gay. The National Security Act (NSA), largely mirroring the McCarran Rider at issue in *Service*, gave the CIA Director authority to discharge any employee whenever he "shall deem such termination necessary or advisable in the interests of the United States." *Id.* at 600, 108 S.Ct. 2047 (quoting NSA § 102(c)). Also as in *Service*, the Director had promulgated regulations to guide his discretion under that section, but, by contrast, these were not binding limits on that discretion. *See Doe v. Casey*, 796 F.2d 1508, 1519–20 (D.C.Cir. 1986), *aff'd in part and rev'd in part sub. nom. Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). Where the only limit on the Director's discretion was the statute, the Court held that under the APA the Director's termination decisions were not subject to judicial review except for potential constitutional violations. *Id.* at 604–05, 108 S.Ct. 2047.

Because our Court of Appeals had determined that the CIA's regulations did not bind the Director's discretion, the Supreme Court did not decide whether the APA forecloses review where an agency retains the substantive discretion to discharge an employee for any reason but is subject to self-imposed procedures before exercising that discretion. The CIA conceded before the Court that if it had violated its gratuitous regulations, judicial review would have been available *under the APA* as a violation of the NSA. *See Webster*, 486 U.S. at 602 n. 7, 108 S.Ct. 2047;

*cf. id.* at 610–11, 108 S.Ct. 2047 (Scalia, J., dissenting in part).

As Justice Scalia's dissent demonstrates, the majority's reasoning leads to the conclusion that under the APA Congress can make an agency decision unreviewable because there is "no law to apply," but the agency can gratuitously supply "law" that limits discretion sufficient to trigger judicial review under 5 U.S.C. § 701(a)(2). *Accord Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C.Cir. 1988); *California Human Development Corp. v. Brock*, 762 F.2d 1044, 1052–53 (D.C.Cir.1985) (Scalia, J., concurring). That also was the reasoning of both the majority and the dissent in the case below in our Court of Appeals. *See, e.g., Casey*, 796 F.2d at 1528–29 (Buckley, J., dissenting in part) (judicial review under *Service* limited to whether the Director adhered to "the 'procedural requirement' that he deems the termination to be in the national interest").[40] The Court has not had occasion to refine the analysis further since *Webster*.[41]

## V.

Although LSC is to be treated as a private corporation for most purposes, the Court has determined above that LSC is a public agency bound by the Constitution. Whether Wilkinson can sue LSC under the *Accardi* doctrine turns on whether the principle is at least in some respects constitutional. The survey of precedent above reveals divided *dicta* on the source of the *Accardi* doctrine.[42] This division reflects a

**40.** The *Casey* majority's reasoning embraced this minimal procedural review as well. Because no issue was raised about the Director's procedure for invoking a national security reason for the discharge, the Supreme Court did not comment on the limited procedural review that Judge Buckley considered available.

**41.** In its most recent comment, the Court has again simply characterized the *Accardi* doctrine as a "familiar rule of administrative law." *See Fort Stewart Schools v. Federal Labor Relations Authority*, 495 U.S. 641, 654, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990); *see also Equal Employment Opportunity Comm. v. Shell Oil Co.*, 466 U.S. 54, 67, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984) ("Until rescinded, [EEOC's] rule is binding on the Commission as well as complainants.")

**42.** *Compare, e.g., Caceres*, 440 U.S. at 752–53, 99 S.Ct. 1465 (suggesting Due Process Clause implicated where agency's violation of rules causes prejudice,) *and id.* at 757–58 & n. 1 (Marshall, J., dissenting) (*Accardi* doctrine based on "a judgment, central to our concept of due process, that government officials no less than private citizens are bound by rules of law") *with Horowitz*, 435 U.S. at 92 n. 8, 98 S.Ct. 948 (*Accardi* doctrine reflects principles of federal administrative law not Due Process); *see also Whims v. Harbaugh*, 139 F.3d 897 (4th Cir.1998) (table), 1998 WL 171325 * 1 & n. 2 (unpublished memorandum cited only as evidence of unresolved state of the law) (treating as open question whether federal court can hear *Accardi* claim brought against state agency); *Clarry v. United States*, 85 F.3d 1041, 1047 (2d Cir.1996) (*Accardi* doctrine is a "judicially-evolved rule ensuring fairness in ad-

tension between a general recognition of primacy of the rule of law and a concern that if the *Accardi* doctrine is recognized as a constitutional principle, it will lead to unrestrained judicial review of both federal and state agency decisionmaking. When synthesized, however, the precedents yield a more nuanced statement of the *Accardi* doctrine that adequately mediates this tension.

## A. Constitutional Roots of the *Accardi* Doctrine

 The federal Constitution embraces and embodies the cardinal principle that this is a nation subject to the rule of law, and as such, agents of the government are bound to follow the law. *United States v. Lee*, 106 U.S. 196, 220–21, 1 S.Ct. 240, 27 L.Ed. 171 (1882); *cf. Reuters Ltd. v. Federal Communications Comm.*, 781 F.2d 946, 947 (D.C.Cir. 1986) (*Accardi* doctrine is a "venerable" precept "which lies at the foundation of the modern administrative state"). Plausibly, the Constitution's rule-of-law requirement could be derived from Article II's admonition that the President "shall take Care that the Laws be faithfully executed."[43] But history,

precedent, and application of the doctrine to all branches of government demonstrate that it is the fundamental concept of due process expressed in the Fifth and Fourteenth Amendments that gives life to the *Accardi* doctrine.

Holding the requirement that government actors be bound by the law to be anything less than constitutional would be unsustainable. For, were the rule of law simply a subconstitutional rule of convenience, it would be within the power of Congress to enact a statute freeing those who administer the law from any obligation to adhere to it. Although the constitutional guarantee of equal protection might mitigate the worst abuses that could occur under such a regime, the notion that Congress could authorize a state of affairs by which we all were bound by law while government officials remained free to exercise their authority arbitrarily and capriciously violates the essence of due process and runs contrary to centuries of Anglo–American jurisprudence.[44]

Although the Due Process Clause would appear to be the natural home for the rule-of-law principle, locating the principle there

ministrative proceedings") (internal quotation and citation omitted); *VanderMolen v. Stetson*, 571 F.2d 617, 624 (D.C.Cir.1977) (*Accardi* doctrine as "fundamental tenet of our legal system"); Joseph T. Small & Robert A. Burgoyne, *Criminal Prosecutions Initiated By Administrative Agencies: The FDA, The Accardi Doctrine and the Requirement of Consistent Agency Treatment*, 78 J.Crim.L. & Criminology 87, 106–07 & n. 83 (1987) (collecting cases).

43. *See* U.S. Const. art. II, § 3. On the theory of a unitary executive, *see generally* Steven G. Calabresi and Kevin H. Rhodes, *The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 Harv.L.Rev. 1153 (1992), administrative agencies remain under presidential control and are therefore subject to the President's responsibilities under the Take Care Clause. Given the expansive powers delegated by Congress to the agencies, the term "faithfully execute" would encompass an agency's obligation to conform even its informal, adjudicative decisions to the rules it had promulgated. *See Arizona Grocery*, 284 U.S. at 389, 52 S.Ct. 183.

An Article II explanation for the obligation of agencies to follow their own rules has certain appealing features. It would, for example, moot the *Horowitz* Court's implicit concern that rooting the *Accardi* doctrine in the Due Process Clause would lead *ipso facto* to federal court

review of procedural violations by state agencies. Ultimately, though, this approach is unpersuasive because it could give rise to the negative inference that while the executive branch is bound by the law, Congress and the courts are not. Further, an Article II explanation for the *Accardi* doctrine also would leave the *Yellin* Court's application of the doctrine to Congress unmoored.

44. *See United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (rule of law is "historic commitment"); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 135–37 & n. 32, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Souter, J., dissenting) (rule of law was a "cardinal principle" incorporated in Framers understanding of due process); *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 475–76, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting in part) ("caprice, passion, bias, and prejudice are antithetical to the rule of law"); Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv.L.Rev. 1362, 1393 (1953) ("The Constitution gives [an alien facing deportation] a right, among others, to have the statutes observed."). *cf. Davidson v. New Orleans*, 96 U.S. 97, 102, 24 L.Ed. 616 (1877) (discussing origin of rule of law in England).

is not without its difficulties. Given the doctrinal thicket that has grown up around the Clause's guarantee of fundamental fairness, it becomes necessary to characterize the rule of law as a requirement of either procedural or substantive due process. Either characterization is possible, but a substantive due process explanation is the more persuasive.

### 1. Procedural Due Process

As a matter of procedural due process, a "property" or "liberty" interest must be implicated to trigger the Clause's protection. Some cases suggest that an agency's gratuitous regulations confer such a right on the regulated community. *See Vitarelli*, 359 U.S. at 540, 79 S.Ct. 968; *Mazaleski*, 562 F.2d at 719 (finding the case to be one where the "government employee has no procedural due process rights apart from those which the agency has chosen to create by its own regulations....").[45] On that view, the *Accardi* doctrine simply collapses into the Due Process Clause, and for the reasons discussed above, LSC would be subject to the *Accardi* doctrine. But more recent precedent rejects that approach. *See Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (state's gratuitous procedural regulations do not give rise to substantive right protected by Due Process Clause); Raoul Berger, *Do Regulations Really Bind Regulators?*, 62 Nw.U.L.Rev. 137, 150–51 (1967). Additionally, even if procedural regulations conferred procedural "property" interests, finding such an interest does not end the inquiry. A court would not simply require that the agency adhere to its procedures but would have to independently assess what process is due. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893,

47 L.Ed.2d 18 (1976); *Bills v. Henderson*, 631 F.2d 1287, 1298–99 (6th Cir.1980); *see also* Schwartz, *Agency's Violation of its Own Regulations*, 44 Admin.L.Rev. at 681 & n. 128.

A second source of potential procedural due process review would be the "right, possessed by every citizen, to require that the government be administered according to law ...." *See Fairchild v. Hughes*, 258 U.S. 126, 129–30, 42 S.Ct. 274, 66 L.Ed. 499 (1922). Although in *Fairchild*, the Court found that plaintiffs had no standing to sue because no injury from the alleged wrong had been suffered, the "right" to have the laws administered correctly could be seen as the constitutional basis for the *Accardi* doctrine. However, that "right" is now no more than an "undifferentiated public interest" in vindicating the rule of law. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, ——, 118 S.Ct. 1003, 1018, 140 L.Ed.2d 210 (1998). As a result, it is now difficult for a plaintiff injured by an agency's violation of a gratuitous procedural regulation to claim that the violation deprived her of a protected interest in having the government obey the law.

### 2. Substantive Due Process

Substantive due process then is the source of the constitutional rule-of-law principle. Although the Supreme Court is reluctant to extend substantive due process, *see, e.g., Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), no extension is required here; long tradition recognizes that the Due Process Clause has as its touchstone "protection of the individual against arbitrary action of government,

---

**45.** *Mazaleski* appears to be internally inconsistent on this point. Having recognized that due process protection extends only to "property" or "liberty" interests, 562 F.2d at 709, the court concluded that the agency's regulations did not created a "property" interest because plaintiff could be fired for any reason, *id.* at 709–10 & n. 23, nor was he deprived of a "liberty" interest. *Id.* at 714. Nevertheless, after applying the *Accardi* doctrine and finding that the agency had violated the procedures set forth in its personnel manual, the court concluded that plaintiff had been "wronged" because he had been deprived of those "procedural due process rights" created

by the regulation. *Id.* at 719. Perhaps the court meant to qualify its earlier statement that the regulations created no "property" interest by determining that even where the regulations do not contain a "for cause" requirement that would give rise to one form of due process "property," regulations mandating binding procedures can also confer constitutional "property" rights on those entitled to insist on an agency's compliance with those procedures. *See also Gardner v. Federal Communications Comm'n*, 530 F.2d 1086, 1089–90 (D.C.Cir.1976) (FCC's self-imposed notice requirement gave rise to "expectation" that created "legal burden" on agency).

... whether the fault lies in a denial of fundamental procedural fairness .. or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, ——, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998) (citations and quotations omitted); *Daniels v. Williams*, 474 U.S. 327, 330–32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Moreover, recognizing that the Due Process Clause requires government to be bound by law does not lead to unchecked judicial interference in the administration of the law. *See Berger, Do Regulations Really Bind Regulators?*, 62 Nw.U.L.Rev. at 149–52. Some decisions and commentators have assumed that if the *Accardi* doctrine is a Due Process requirement, then every violation of an agency's regulations is an actionable constitutional violation.[46] That assumption is unwarranted; it produces an upside-down result by which an agency's violation of its own gratuitous rules would violate a constitutional norm, whereas an agency's violation of a statute would violate a lesser, statutory norm. *See Webster*, 486 U.S. at 604–05, 108 S.Ct. 2047 (preserving judicial review of constitutional claims only). The flaw in the assumption is that agency transgressions of law are not *actionable* as violations of the general rule-of-law principle.

Rather, the rule-of-law requirement implicit in the notion of due process, although added to the Constitution in the Fifth and Fourteenth Amendments, reflects a founding assumption or first principle. Our nation would have no need for a Constitution to secure individual liberty if the Government were free to disregard its mandates. It is because governmental actors are bound by the law that the Constitution serves to limit the power of government. It is because public officials are bound by law that individuals may seek review and relief in the courts. The founding principle that public officials must obey the law is a necessary antecedent for a claim against such an official for violation of law.[47] But this general principle only lays the groundwork for the enforcement of the more specific laws that prescribe rules of conduct.

Procedurally, when judicial review is sought to remedy a government official's violation of a rule of conduct, the claim does not arise under the general constitutional principle of the rule of law; rather, the claim arises under the specific legal provision alleged to have been violated. For this reason the *Caceres* Court could both recognize that agencies are bound by their own rules and still have no constitutional concerns about the IRS's conceded violation of its gratuitous procedural rules—the violation arose under the regulations, not the Constitution. *See Caceres*, 440 U.S. at 751–52 & n. 14, 99 S.Ct. 1465.

This understanding of the constitutional position of the *Accardi* doctrine narrows the gap between the *Horowitz dictum* and the *Caceres* dissent. I agree with Justice Marshall's assertion that the rule-of-law aspect of the *Accardi* doctrine can be explained only as a reflection of Due Process jurisprudence. *See Caceres*, 440 U.S. at 758 & n. 1, 99 S.Ct. 1465 (Marshall, J., dissenting). But the *Horowitz* Court understandably rejected the suggestion that the university's alleged violation of its own gratuitous student evaluation procedures would necessarily state a constitutional claim under the *Accardi* doctrine. *See Horowitz*, 435 U.S. at 92 n. 8, 98 S.Ct. 948.[48]

---

**46.** *See Horowitz*, 435 U.S. at 92 n. 8, 98 S.Ct. 948 (*dictum*); *Caceres*, 440 U.S. at 765, 99 S.Ct. 1465 (Marshall, J., dissenting); Peter Raven-Hansen, *Regulatory Estoppel: When Agencies Break Their Own "Laws"*, 64 Tex.L.Rev. 1, 10 (1985).

**47.** This "first principle" approach also explains what some commentators may have meant when referring due process in its "primal sense." *See* Rodney A. Smolla, *The Erosion of the Principle that the Government Must Follow Self-Imposed Rules*, 52 Fordham L.Rev. 472, 496–97 & n. 155 (1984); Berger, *Do Regulations Really Bind Regulators?*, 62 Nw.U.L.Rev. at 149–50.

**48.** The jurisdiction of the federal courts is limited, in part, to those cases or controversies that "arise under" federal law. *See* U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1331. Plaintiff's *Accardi* claim in *Horowitz*, absent the deprivation of a property or liberty interest, would not have involved a federal question because it would have "arisen under" the state university's regulation. *Accord Bates v. Sponberg*, 547 F.2d 325, 331 (6th Cir.1976).

Thus, the *Accardi* doctrine is a constitutional hybrid. Its requirement that agencies follow their own rules reflects a founding, constitutional principle that the Government is bound by law. But the Constitution does not immediately authorize judicial review by a federal court every time a state actor violates the law. *Cf. Columbia Broadcasting Sys. v. United States,* 316 U.S. 407, 418, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). Rather, the rule of law is enforced at the subconstitutional level. Jurisdiction to exercise judicial review of an agency's violation of law depends upon the law alleged to have been violated.

In this case, Wilkinson has alleged that his *Accardi* claim arises under the laws of the United States. *See* 28 U.S.C. § 1331.[49] Because an *Accardi* claim arises under the specific law alleged to have been violated, it is not enough for Wilkinson to say that LSC is a public agency for constitutional purposes and that the *Accardi* doctrine reflects a constitutional requirement that public agencies abide by law. For this Court to have federal question jurisdiction over his *Accardi* claim, LSC's personnel regulations must also be federal laws. If LSC's "private" status means that its self-imposed rules are not "law," the *Accardi* doctrine does not apply, and Wilkinson's claim fails as a matter of law.

### B. The "Law" To Which Agencies Are Bound

While it can hardly be gainsaid that public officials must obey the law, in the administrative context, a more nuanced question arises as to what constitutes "law" binding on the agencies.[50] The question is not posed in its broadest, jurisprudential sense.[51] Rather the question is to what sources must a court look to determine whether a government actor is prohibited from taking the action (or inaction) alleged to have been wrongfully done (or not done).

Form should be respected. Laws enacted through formal processes clearly are binding. Thus the Constitution, statutes, and "legislative rules" that have been promulgated after public notice and comment are binding:

> Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life.

*Reuters,* 781 F.2d at 951.

■ But determination of the "law" that binds agencies under the *Accardi* doctrine goes beyond form and looks to substance. *Ruiz* teaches that even internal, unpublished rules can be binding, at least on the agency. *See Ruiz,* 415 U.S. at 235, 94 S.Ct. 1055; *Massachusetts Fair Share v. Law Enforcement Assistance Admin.,* 758 F.2d 708, 711 (D.C.Cir.1985). Ultimately, with regard to rules that have not been formally promulgated, the "law" to which an agency will be bound are those rules to which it intended to be bound.[52] This "law" can include written

---

**49.** In his complaint, Wilkinson also alleged diversity jurisdiction, which he could have invoked had he proceeded on a breach of contract theory.

**50.** *See Lyng v. Payne,* 476 U.S. 926, 937, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *Doe v. Hampton,* 566 F.2d 265, 280–81 (D.C.Cir.1977) ("not every piece of paper emanating from a Department or Independent Agency is a regulation.") (internal quotations and citation omitted).

**51.** *E.g.,* H.L.A. HART, THE CONCEPT OF LAW 1 (1961) ("'Few questions concerning human society have been asked with such persistence and answered by serious thinkers in so many diverse, strange, and even paradoxical ways as the question 'What is law?' '").

**52.** *See, e.g., Frizelle v. Slater,* 111 F.3d 172, 177 (D.C.Cir.1997); *Vietnam Veterans of America v. Secretary of the Navy,* 843 F.2d 528, 536–38

(D.C.Cir.1988); *Padula v. Webster,* 822 F.2d 97, 100 (D.C.Cir.1987). *But see* Schwartz *Agency's Violation of its Own Regulations,* 44 Admin.L.Rev. at 675–66 (the "law" under *Accardi* doctrine should be limited to valid legislative rules and, perhaps, procedurally flawed, binding rules); Raven–Hansen, *Regulatory Estoppel,* 64 Tex.L.Rev. at 16–19; *cf. Si v. Slattery,* 864 F.Supp. 397, 403–06 (S.D.N.Y.1994) (new Administration's withdrawal of pending rule from publication deprives it of force and effect of law). Whatever appeal the commentators' views may have, binding precedent dictates that, under the *Accardi* doctrine, an agency is bound by some rules which it could not enforce against the public.

rules governing adverse action towards employees that are not published in the Federal Register, *see Massachusetts Fair Share,* 758 F.2d at 711, and to procedures in agency employee manuals. *See Doe v. Hampton,* 566 F.2d 265, 280 (D.C.Cir.1977); *Mazaleski,* 562 F.2d at 717 & n. 38. It can also include those rules implicit in an agency's course of conduct where that conduct gives rise to a "common law" administrative rule. *Doe,* 566 F.2d at 281–82.

█ In sum, the following syllogism emerges: The Due Process Clause establishes that public officials are bound to follow the law. Agency regulations intended to be binding are law—or, if qualification need be made, have the force and effect of law as applied to the agency. Therefore, the Due Process Clause requires that agency officials follow their own rules, even those promulgated gratuitously. *See Service,* 354 U.S. at 388, 77 S.Ct. 1152.

## C. *Accardi* As a Source of Judicial Review

But, the precedent demonstrates that the *Accardi* doctrine does more than bind public officials to "law." The doctrine also served as the Supreme Court's basis for judicial review to enforce an agency's obligations under its own "laws." *See, e.g., Vitarelli,* 359 U.S. at 539, 79 S.Ct. 968; *IMS, P.C. v. Alvarez,* 129 F.3d 618, 621 (D.C.Cir.1997) (failure to follow regulations "is fatal to the deviant action"). A difficult question that has evaded a certain answer is whether some judicial review under the *Accardi* doctrine is constitutionally mandated.[53]

In the context of the current inquiry, in which the Court must determine if the Legal Services Corporation can be sued for violating its own rules, even assuming LSC's personnel regulations are "laws," it may also be necessary to determine that the Constitution provides that some judicial review be available for Wilkinson to state an *Accardi* claim

---

**53.** *See Webster,* 486 U.S. at 603, 108 S.Ct. 2047; *Johnson v. Robison,* 415 U.S. 361, 373–74, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); STEPHEN G. BREYER AND RICHARD B. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY 1077 (2d ed.1985) [hereafter BREYER & STEWART, ADMINISTRATIVE LAW] ("The courts have not dealt explicitly with the doctrine of a constitutional right to judicial review, nor have they defined its contours."); *cf. Magana-Pizano v. Immigration and Naturalization Serv.,* 152 F.3d 1213, 1220 (9th Cir.1998) ("[E]limination of all judicial review of executive detention violates the Constitution."); *Lee v. Reno,* 15 F.Supp.2d 26, 40 (D.D.C.1998) (same) (alternate holding), *appeal docketed,* No. 98–5448 (D.C.Cir. Sept. 21, 1998).

As to subconstitutional claims, although there is a strong presumption that courts can review agencies' compliance with subconstitutional norms, Congress apparently can constitutionally preclude such review. *See Transactive Corp. v. United States,* 91 F.3d 232, 236 (D.C.Cir.1996). To the extent that Congress can wall off agencies from judicial review of statutory compliance, it follows that regulatory compliance issues could also be removed from the courts. Certainly, Congress can preclude judicial review of *Accardi* claims where it has provided an adequate alternative administrative review scheme. *See generally Harrison v. Bowen,* 815 F.2d 1505 (D.C.Cir. 1987) (discussing in detail administrative review scheme for federal employees under the Civil Service Reform Act of 1978 and holding that Congress intended by such scheme to preclude review of *Accardi* claims in the district courts).

But the *Accardi* precedent suggests that there may be a narrow class of cases for which the Due Process Clause mandates that judicial review be available for an agency's violation of its own rules. These would be where an agency has bound its discretion by promulgating procedural rules to protect the interests of a class of individuals, and the agency violates those rules such that a member of that class suffers substantial prejudice caused by the violation and no alternative remedy is available. *See Caceres,* 440 U.S. at 752–53, 99 S.Ct. 1465 (Due Process Clause implicated where individual is intended beneficiary of regulation, relies on regulation, and suffers "substantially" because of agency's violation); *Ruiz,* 415 U.S. at 235–36, 94 S.Ct. 1055; *Yellin,* 374 U.S. at 121, 83 S.Ct. 1828; *Vitarelli,* 359 U.S. at 540, 79 S.Ct. 968 ("departures from departmental regulations in matters of this kind involve more than mere consideration of procedural irregularities"); *Service,* 354 U.S. at 388, 77 S.Ct. 1152; *Accardi,* 347 U.S. at 266–68, 74 S.Ct. 499 ("at least he will have been afforded that due process required by the regulations"); *Bridges,* 326 U.S. at 154, 65 S.Ct. 1443; *Arizona Grocery,* 284 U.S. at 388–89, 52 S.Ct. 183; *Bilokumsky,* 263 U.S. at 155–57, 44 S.Ct. 54; *see also* BREYER & STEWART, ADMINISTRATIVE LAW at 531 (commenting on *Caceres* dissent's position); *cf. American Farm Lines,* 397 U.S. at 539, 90 S.Ct. 1288 (judicial review available upon showing of "substantial prejudice," even when the complaining party is not an intended beneficiary of regulation).

against LSC.[54] If Congress intended to immunize LSC from judicial review of its violations of self-imposed rules, this Court would be required to respect that determination unless the Constitution overrode it.

As to the question of whether LSC's personnel regulations are "laws" under the *Accardi* doctrine, our Court of Appeals has previously determined that Congress gave LSC general rulemaking authority. *See Texas Rural Legal Aid, Inc. v. Legal Services Corp.*, 940 F.2d 685, 690–91 (D.C.Cir.1991); *Velazquez v. Legal Services Corp.*, 985 F.Supp. 323, 328–29 (E.D.N.Y.1997). It may well be that Congress intended LSC to be treated as a private employer and that its internal personnel rules should not be treated as "law" under the *Accardi* doctrine. *Cf. Multnomah Legal Services Workers Union v. Legal Services Corp.*, 936 F.2d 1547, 1554–57 (9th Cir.1991) (Congress immunized LSC from general administrative law requirement of reasonableness and even if LSC were an agency its unpublished internal interpretive rules not binding) (dicta). But in the absence of an express limitation on LSC's rulemaking powers, the Court must treat LSC's self-imposed binding norms as law under the *Accardi* doctrine.[55]

As to judicial review, the LSC Act does not contain an express review provision. Nonetheless, the LSC Act impliedly provides for judicial review when LSC exercises its rulemaking authority vis-à-vis its grantees. *Texas Rural Legal Aid, Inc.*, 940 F.2d at 696–97. LSC's adjudicative decisions to cut funding to its grantees also are reviewable under this implicit provision.[56] The full scope of that implied provision is not clear.[57] Consequently, because LSC is a government agency for constitutional purposes, because the *Accardi* doctrine reflects a constitutional principle that public agencies with the power to make law must follow that law, because LSC has been given general rulemaking authority, and because Congress has not expressed an intent to preclude judicial review of LSC's compliance with its unpublished rules, this Court has jurisdiction and holds that LSC is subject to the *Accardi* doctrine. *Cf. Neighborhood Legal Services, Inc. v. Legal Services Corp.*, 466 F.Supp. 1148, 1151–55 (D.Conn.1979) (finding without explanation federal question jurisdiction to exercise judicial review and requiring LSC to comply with publication requirements of its rules and LSC Act without mentioning the *Accardi*

**54.** As the analysis above demonstrates, Wilkinson's *Accardi* claim is not in and of itself a constitutional claim; it arises under LSC's alleged regulations. If the Constitution does not require that some review be available for an agency's violation of its own regulations, then the effect of the LSC Act may well be to insulate LSC from Wilkinson's *Accardi* claim.

**55.** By requiring that a clearer restriction on LSC's lawmaking power be expressed, the Court avoids the question of whether, under the *Accardi* doctrine and the *Lebron* analysis, the Court could find that a government-created, private corporation's rules are federal law and exercise judicial review of alleged violations of that law, notwithstanding a congressional statement that the entity should be treated as a private corporation.

**56.** *E.g., National Senior Citizens Law Ctr. v. Legal Services Corp.*, 751 F.2d 1391 (D.C.Cir.1985), *aff'g* 581 F.Supp. 1362 (D.D.C.1984); *San Juan Legal Services, Inc. v. Legal Services Corp.*, 655 F.2d 434, 437–39 (1st Cir.1981) (federal question jurisdiction included *Accardi* claim); *Spokane County Legal Services v. Legal Services Corp.*, 614 F.2d 662, 669 (9th Cir.1980); *National Ctr. for Youth Law v. Legal Services Corp.*, 749 F.Supp. 1013, 1016 (N.D.Cal.1990); *National Social Sci-*

*ence and Law Ctr., Inc. v. Legal Services Corp.*, 684 F.Supp. 296, 300 (D.D.C.1987); *cf. National Clearinghouse for Legal Services, Inc. v. Legal Services Corp.*, 674 F.Supp. 37, 40–42 (D.D.C. 1987) (exercising general federal question jurisdiction to review contractor's claim that LSC's decision to reduce funding violated its own regulations).

**57.** *See Legal Services Corp. of Prince George's County v. Ehrlich*, 457 F.Supp. 1058, 1063 & nn. 29–30 (D.Md.1978) (assuming without deciding that review would be available for LSC's violation of its own procedural regulations); *see also Regional Mgmt. Corp. v. Legal Services Corp.*, 10 F.Supp.2d 565, 569–70 (D.S.C.1998) (LSC Act implicitly provides for rational-basis review of LSC adjudicative decisions but no private right of action may be maintained under LSC Act), *appeal docketed* (4th Cir. Aug. 4, 1998); *Hedges v. Legal Services Corp.*, 663 F.Supp. 300, 300–04 (N.D.Cal.1987) (rejecting LSC's contention that former employee's state-law wrongful termination claims arose under federal law); *Grassley v. Legal Services Corp.*, 535 F.Supp. 818, 826 (S.D.Iowa 1982) (LSC Act does not provide private right of action).

doctrine). LSC's motion for judgment as a matter of law on this claim is denied.

## VI.

After having related the lengthy tale of the *Accardi* doctrine's development, and interpreting the doctrine to conclude that Wilkinson was not precluded as a matter of law from seeking review under the doctrine, the Court returns to Wilkinson's *Accardi* claim for a brief coda.

## A. Rules for Application of the *Accardi* Doctrine

The *Accardi* doctrine's rule-of-law principle is unyielding, but its application is not.[58] In other words, adherence to the rule of law requires courts to declare an agency's violation of law, even a binding, though gratuitous, procedural regulation, to be just that— a violation of law. *Cf. Korematsu v. United States*, 323 U.S. 214, 244, 65 S.Ct. 193, 89 L.Ed. 194 (1945) (Jackson, J., dissenting) ("[I]f we cannot confine military expedients by the Constitution, neither would I distort the Constitution to approve all that the military may deem expedient."). But pragmatic considerations enter into analysis of whether a procedural violation calls for a judicial remedy. *Cf. Shook v. District of Columbia Financial Responsibility and Mgmt. Assistance Auth.*, 132 F.3d 775, 784 (D.C.Cir.1998) (exercising doctrine of remedial discretion to afford agency's *ultra vires* actions de facto validity).

■ Courts are not to require agencies to cross every "t" and dot every "i" without regard to the costs, difficulties, and proportionality of ordering such remedies. Rather, the *Accardi* doctrine establishes that the rule of law is to be reasonably enforced. *Caceres* and *American Farm Lines* stand for the proposition that when a procedural violation is deemed immaterial or harmless, a court will not require an agency to engage in the empty exercise of repeating a procedure according to rules where the result of the procedure is foreordained. *Cf. Lyng*, 476 U.S. at 941–42, 106 S.Ct. 2333; *Schweiker v. Hansen*, 450 U.S. 785, 789–90, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam) (indicating both that agency manual was nonbinding and even if binding failure to comply was harmless). The counterfactual analysis [59] required by the harmless error inquiry, however, is limited in scope. *See Mazaleski v. Treusdell*, 562 F.2d 701, 719 & n. 41 (D.C.Cir. 1977) ("[A] procedural error is not made harmless simply because [a] government em-

---

**58.** To the extent that unfortunate phrasing in *American Farm Lines* suggests that agencies are free to "relax" or "modify" binding, internal, "housekeeping" rules at any time, *see American Farm Lines*, 397 U.S. at 539, 90 S.Ct. 1288, that decision is better understood as expressing the harmless error rule under the *Accardi* doctrine. *See Caceres*, 440 U.S. at 752, 99 S.Ct. 1465 (agency's violation was harmless); *American Farm Lines*, 397 U.S. at 538, 90 S.Ct. 1288 (same); *cf.* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *Consolidated Gas Supply Corp. v. FERC*, 606 F.2d 323, 328–29 (D.C.Cir.1979) (APA requires incorporation of prejudicial error standard even if judicial review provided for by different statute); Berger, *Do Regulations Really Bind Regulators?*, 62 Nw.U.L.Rev. at 158–71 (discussing APA's prejudicial error standard).

The *Caceres* Court expressed an agnostic view on this point. On the one hand, agencies are not free to violate their own rules, *Caceres*, 440 U.S. at 751 n. 14, 99 S.Ct. 1465, but on the other hand, sometimes they are. *Id.* at 754 n. 18, 99 S.Ct. 1465 ("it seems clear that agencies are not required, at the risk of invalidation of their action, to follow all of their rules"). Respectfully, it must be pointed out that, assuming the "rules" referred to by the latter statement are law, the statement that agencies are not bound by the law of their own creation is at variance with the founding rule-of-law principle. *Accord* Berger, *Do Regulations Really Bind Regulators?*, 62 Nw. U.L.Rev. at 179. *But see* Note, *Violations By Agencies of Their Own Regulations*, 87 Harv. L.Rev. 629, 647 (1974) (finding an equal protection rationale for the *Accardi* doctrine and arguing that agencies may violate their laws so long as it is done even-handedly). But when justifying occasional procedural lapses, the *Caceres* court focused on when regulatory violations will lead a court to invalidate the action. *Caceres*, 440 U.S. at 754 n. 18, 99 S.Ct. 1465. The assertion that not every procedural violation will invalidate agency action is better understood as taking due account of the rule of prejudicial error.

**59.** Counterfactual analysis occurs when the court or a jury must inquire as to what might have been, counter to the facts as established in the record. *See generally* Robert N. Strassfeld, *If . . . Counterfactuals in the Law*, 60 Geo.Wash.L.Rev. 339 (1992).

ployee appears to have had little chance of success on the merits anyway.").

The *Accardi* doctrine also has some additional flex. Although courts consider a range of sources that may create law binding on an agency, there is no presumption that every general guideline is a binding rule. Due regard must be given to an agency's legitimate interest in setting forth general goals and procedures without having a court "transmogrify those guidelines into binding norms." *Community Nutrition Institute v. Young*, 818 F.2d 943, 949 (D.C.Cir.1987). An agency or other lawmaking body has significant discretion to determine whether a provision is binding "law" or precatory policy.[60]

Even when a lawmaking body has created binding law, its interpretation of that law will receive substantial deference from the courts. *See, e.g., Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) ("agency's construction of its own regulations is entitled to substantial deference"); *Yellin*, 374 U.S. at 116–17, 83 S.Ct. 1828 ("Weight should be given such a practice of the Committee in construing its rules...."); *cf. Olim v. Wakinekona*, 461 U.S. 238, 242–44 n. 5, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (essentially deferring to state supreme court's interpretation of due process status of state regulation); *Texas Rural Legal Aid, Inc.*, 940 F.2d at 689–90 (LSC entitled to deference in its interpretation of LSC Act).

## B. The Provisions of LSC's Personnel Manual Are Not Binding Rules

Applying these rules to this case, it is clear that an agency's personnel handbook can be the source of binding rules where the agency treats them as such. *See Frizelle*, 111 F.3d at 177. But Wilkinson's *Accardi* claim, like his Due Process Claim, fails on the facts. In this case, LSC made explicit that the 1990 Manual did not create binding obligations on it or substantive rights for its employees. Pl.'s Ex. 14 at 1 ("None of the benefits or policies in this manual are intended by reason of their publication to confer any rights or privileges upon an em-

ployee...."). Also, LSC in practice has been an employer-at-will at all times. Tr. at 136–41 (Dickerson). Moreover, even if LSC intended its performance evaluation procedures to be binding, those procedures were never intended to apply to LSC executives such as the Inspector General. The LSC President—the only other officer who reported directly to the Board—had never been evaluated by the Board according to those procedures, and the IG's job was not one for on-the-job training. Tr. at 197 (Dana).

Finally, even if Wilkinson had been entitled to receive the performance evaluations and an opportunity to participate in a performance improvement plan, the failure to afford him those procedures was harmless. Even within the narrow scope of the harmless error rule, it is evident on these facts that Wilkinson would not have had his contract renewed in any case. At a fundamental level, his view of his responsibilities under the IG Act conflicted with the Board's. Performance evaluations would have been immaterial to the resolution of that conflict, and that conflict was the Board's primary reason in choosing not to renew Wilkinson's contract. *See Simard v. Board of Educ. of Groton*, 473 F.2d 988, 994 (2d Cir.1973) (school's alleged failure to evaluate non-tenured teacher according to procedure harmless because teacher dismissed for reasons other than classroom competence); *cf. Air Canada v. Department of Transportation*, 148 F.3d 1142, 1156–57 (D.C.Cir.1998) (party failed to demonstrate prejudice under APA); *Consolidated Gas Supply Corp. v. Federal Energy Regulatory Comm.*, 606 F.2d 323, 329 (D.C.Cir.1979) (remand under APA for error only when there is substantial doubt that the administrative agency would have reached the same result absent the error).

## VII.

Two additional issues deserve mention. First, because Wilkinson did not prevail on his *Accardi* claim, this Court has not had to reach the question of what his remedy would

---

**60.** *E.g., Vietnam Veterans*, 843 F.2d at 539; *United States v. Alston*, 609 F.2d 531, 536–37 (D.C.Cir.1979) (Attorney General's "Petite policy

is not law"); *Nichols v. Reno*, 931 F.Supp. 748, 751–52 (D.Colo.1996); *Walker v. Reno*, 925 F.Supp. 124, 134–35 (N.D.N.Y.1995).

have been had he prevailed. Specifically, while reinstatement is an equitable remedy available in *Accardi* cases, *see Vitarelli*, 359 U.S. at 546, 79 S.Ct. 968, to the extent that Wilkinson sought substantial monetary relief, the Court makes no comment on whether a plaintiff can whipsaw a government-created private corporation by simultaneously seeking a liability determination based on a theory applicable only to the Government, and a remedy from which the Government is in most cases immune. *See Lebron*, 513 U.S. at 392, 115 S.Ct. 961 (Congress may well waive a government corporation's claim to sovereign immunity when the corporation is to be treated as "private"); *see also* 42 U.S.C. § 2996d(f) (not including Back Pay Act, 5 U.S.C. § 5596 as provision applicable to LSC employees).

Second, the coexistence of the *Accardi* doctrine and the Administrative Procedure Act as two independent sources of judicial review has been for the most part benign. For example, with respect to the question of what "law" binds agencies, our Court of Appeals had developed one line of cases under the *Accardi* doctrine, and another under the APA concerning whether the court could or must require agencies to abide by their interpretive rules or policy statements. In *Vietnam Veterans*, Judge Williams, writing for the court, reconciled these by holding that under either theory, enforceable rules are those to which the agency intends to be bound. *See Vietnam Veterans*, 843 F.2d at 535–38; *cf. generally* Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L.J. 1311 (1992).[61]

The one area of potential conflict arises in a case such as this, where the party seeking judicial review concedes that the agency was free to make its decision for any reason but was bound to follow certain procedures before making its decision. The *Accardi* cases have found that exercise of review is appropriate because the procedural rules are law that agencies are bound to obey. *E.g., Vitarelli*, 359 U.S. at 540, 79 S.Ct. 968; *Service*, 354 U.S. at 388–89, 77 S.Ct. 1152; *cf. Casey*, 796 F.2d at 1528–29 (Buckley, J., dissenting in part) (where statute leaves substantive decision unfettered but imposes minimal procedural requirement, judicial review available to enforce procedural requirement). Arguably this is consistent with the APA, because an agency can create the law to apply, making judicial review a meaningful exercise. *See Walker*, 925 F.Supp. at 132–33; *cf. Heckler v. Chaney*, 470 U.S. 821, 836, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (expressly leaving this question open).[62]

However, a competing view is that under the APA, where the enabling statute imposes no substantive limits on an agency's discretion, judicial review is not available because that decision has been committed to agency discretion by law even if the agency subsequently imposes procedural rules on itself. *E.g. Webster*, 486 U.S. at 610, 108 S.Ct. 2047 (Scalia, J., dissenting); *cf. Harrison v. Bowen*, 815 F.2d 1505, 1516–18 (D.C.Cir.1987) (judicial review of *Accardi* claims precluded by detailed scheme of administrative review). In *Fried v. Hinson*, 78 F.3d 688 (D.C.Cir. 1996), our Court of Appeals recognized the potential conflict between this interpretation of the APA and the continued availability of judicial review under the *Accardi* doctrine, but left resolution of that conflict for another day, assuming without deciding it could review violation of gratuitous procedural regulation even when substantive decision was

---

61. But in certain other respects, open questions remain as to whether *Accardi* cases and APA cases converge. For example, as Judge June L. Green has recently made plain, a court can rely on the APA to exercise review of an agency's alleged violation of its own personnel rules. *Evans v. Perry*, 944 F.Supp. 25, 29–30 (D.D.C.1996), *aff'd without opinion*, 1997 WL 362499 (D.C.Cir. 1997). But a court can equally rely on the *Accardi* doctrine. *E.g. Frizelle v. Slater*, 111 F.3d 172, 177 (D.C.Cir.1997). Under the APA, a court must take due account of the rule of prejudicial error before ordering a remedy for procedural

non-compliance. *See* 5 U.S.C. § 706. Under the *Accardi* doctrine a court will not set aside agency action if its procedural violation was harmless. *E.g., Mazaleski*, 562 F.2d at 719 & n. 41. Presumably the scope of this inquiry is the same in either case, but it has not explicitly been so held.

62. Because this is considered an open question, the Supreme Court has implicitly limited *Morris v. Gressette*, 432 U.S. 491, 505–07, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977) to its facts.

committed by law to agency discretion. *Id.* at 690.

The analysis above suggests two potential results that could flow from adoption of the latter view of the APA, 5 U.S.C. § 701(a)(2). If the APA and the *Accardi* doctrine were to remain co-equal sources of judicial review, and the APA had been deemed to deny review of an agency's procedural non-compliance where the *Accardi* doctrine had not, the potential for "doctrine shopping" arises. Or, if the interpretation of the APA restricting judicial review prevails, and is considered to trump the availability of review under the *Accardi* doctrine, judicial review of procedural non-compliance claims would be precluded in cases involving agencies subject to the APA but would remain available against government actors not subject to the APA, such as Congress and LSC.

## VIII.

This case arose out of the Legal Services Corporation's decision not to extend the employment contract of its first Inspector General for an additional year. Because of the unique position that congressionally-created "private" corporations such as LSC hold, this otherwise standard-fare employment dispute has generated a series of novel issues. Resolving two of these, the Court has concluded that the nature and structure of LSC render it a public employer for purposes of the Due Process Clause. Further, because the Due Process Clause requires the Government to abide by its own laws, because Congress delegated general rulemaking authority to LSC, and has not limited judicial review for *Accardi* claims, this Court has jurisdiction to consider whether LSC complied with its own rules. On the facts of this case, Wilkinson received all the process he was due, and LSC did not intend for its employee evaluation procedures ·in its personnel manual to be binding regulations. Accordingly, it is hereby

**ORDERED** that Judgment on Count III of the Second Amended Complaint shall enter in favor of defendant Legal Services Corporation and against plaintiff David L. Wilkinson; and it is

**FURTHER ORDERED** that Plaintiff's Exhibit 29 is admitted into evidence.

IT IS SO ORDERED.